### ASSOCIATED PRESS v. KVOS, Inc.
### No. 7798.

Circuit Court of Appeals, Ninth Circuit.
Dec. 16, 1935.

John W. Davis and Wm. C. Cannon,
both of New York City, and C. W. How-

ard and J. W. Kindall, both of Bellingham, Wash., for appellant.

Clarence C. Dill, of Washington, D. C., Kenneth C. Davis, of Seattle, Wash., and Wm. H. Pemberton, of Olympia, Wash., for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a decree dismissing with prejudice a bill in equity brought by the Associated Press, a New York membership corporation, engaged in the gathering and distribution of news and its publication, along with paid advertising matter, in newspapers throughout the United State, against KVOS, Inc., a Washington corporation, also engaged in the gathering of news and its publication with paid advertising matter by radio from Bellingham, Wash. The bill charges KVOS with unfair competition in the pirating of Associated Press news and its publication by KVOS radio in what it calls its "Newspaper of the Air," and seeks injunctive relief. The affidavits on the motion for preliminary injunction describe 180 such piratings in which appear 425 paragraphs identical with the Associated Press news articles.

The appeal presents the following questions, based upon the grounds assigned in the motion to dismiss and on the opposition to the motion for a temporary injunction: (a) Does the matter in controversy exceed the jurisdictional sum of $3,000, exclusive of interest and costs? (b) Is there jurisdictional diversity of citizenship? (c) Does the bill allege a sufficiency of facts to constitute a valid cause of action in equity; and, if so, (d) Should a preliminary injunction have been granted?

The bill's description of the business of the Associated Press is similar to its portrayal in the opinion of the Supreme Court in International News Service v. Associated Press, 248 U.S. 215, 229, 39 S.Ct. 68, 69, 63 L.Ed. 211, 2 A.L.R. 293. Complainant is a co-operative organization incorporated under the membership corporation laws of the state of New York; its members being either proprietors or representatives of about 1,200 newspapers published in all parts of the United States. Complainant gathers in all parts of the world, by means of various instrumentalities of its own, by exchange with its members, and by other appropriate means, news

and intelligence of current and recent events of interest to newspaper readers and distributes it daily to its members for publication in their newspapers. The cost of the service, amounting approximately to many millions of dollars per annum, is assessed upon the members and becomes a part of their costs of operation, to be recouped, presumably with profit, through the publication of their several newspapers. Under complainant's by-laws, each member agrees upon assuming membership that news received through complainant's service is received exclusively for publication in a particular newspaper, language, and place specified in the certificate of membership, that no other use of it shall be permitted, and that no member shall furnish or permit any one in his employ or connected with his newspaper to furnish any of complainant's news in advance of publication to any person not a member. And each member is required to gather the local news of his district and supply it to the Associated Press, and to no one else.

Supplementing the bill is the court's judicial knowledge that, since the International News Service Case, radio broadcasting has been developed and a great business created in circulating advertising along with news and other features to attract its audiences to the advertising. Once this material is gathered its circulation is instantaneous as against from 2 to 24 hours for the press. Radio has added another celerity to news circulation, just as have the railroad and, later, telegraphic transmission. Impairment of radio's service would affect the blind; likewise, impairment of the press would injure the deaf.

So far as concerns soliciting for advertising income, the two processes are alike in that they appeal to the human mind by giving wide circulation through mechanical and physical processes to the advertising intermingled with interest arousing news, comedy and drama. It does not affect the fundamental identity of the two enterprises that the appeal of one is through the auditory and the other through the visual nerve system of the prospective customers of the advertisers whose trade is so solicited. Both businesses require large investments in plants constituting the power creation and the mechanism of circulation. Both necessarily employ large forces of trained experts for gathering their material and personnel in their circulating processes. The many

units in each of the two businesses have nation-wide co-operative organizations for the gathering of their material and making it available to the units appealing to the smallest groups of population. Among these are the complainant, for the member papers it here represents, and for KVOS, as it admits, Radio News Association of New York. KVOS not only admits this, but also claims its news service is far superior to the Associated Press. Hence, without the latter's news, it is able to supply outlying districts with the essentials of the happenings of the day as efficiently as the dweller in cities.

The bill further alleges that many of the newspapers of its members are distributed throughout a circular broadcasting area of 100 miles radius over which the defendant corporation publishes its news and advertising, and that the Associated Press newspapers compete with KVOS in the business of seeking advertising to residents there. Practically all of KVOS' income from which it seeks profit is payment for the service of publishing advertising matter. Likewise, this constitutes a large part of the income of the papers. KVOS' income, mostly from advertising, supports its combined news and advertising circulation without charge to its public. The newspapers' circulation is supported by income which is a combination of charges from advertising and their readers' subscriptions.

Among the Association's many papers alleged to be circulated in the KVOS area are three from which it is charged the gathered news has been appropriated by KVOS. They are the "Bellingham Herald," "Seattle Post Intelligencer," and "Seattle Daily Times." They publish daily and Sunday editions of their papers covering in one or another the morning and evening news distribution.

■ The charge is that KVOS appropriated, from the editions of these three latter papers, the news distributed to the papers by the complainant, and which had been collected for them by complainant's news gathering and by similar activities on the part of all the Association's co-operative members. It is alleged that the appropriated news appearing in the editions of complainant's papers is published by the KVOS broadcast often verbatim, and sometimes slightly altered. The radio publication is completed before all the papers are distributed, and while the news is what the

Supreme Court terms as "fresh". and the journalistic world as "hot." As to those delivered before the broadcast, their subscribers, if using radio, are certain soon after delivery to receive the same news free of charge. It is alleged that not less than 60 per cent. of the inhabitants of the area in which KVOS publishes its news and advertising own or have access to and use the radio. The damage caused complainant by this alleged unfair competition is claimed to be in excess of the jurisdictional amount.

The Supreme Court in the International News Service Case described this appropriation and circulation of a competitor's fresh news as news "pirating," and held that such pirating practices inflict a substantial and irreparable injury to the business of collecting and distributing news and the collector's interest in such news when assembled, which injury, in the circumstances there considered, warranted injunctive relief. The bill here seeks similar relief, on behalf of the plaintiff and the large numbers of its members, from the alleged practices of KVOS. In view of our disposition of the jurisdictional contention in favor of appellant, the paramount question for our consideration is whether the instant case can be distinguished from International News Service v. Associated Press.

The claimed difference is that the pirated news instead of being published by a competing press is published by radio. The characteristics of the differences claimed are: (1) That KVOS seeks the attention of a listening public, paying nothing to the radio publishers, instead of a reading public, paying for its papers; and (2) that the pirated material and accompanying advertising reach the prospective customers almost instantaneously, while the press publication and distribution take from 2 to 24 hours.

These are urged as distinctions making KVOS' acts not competitive, although they may persuade the public not to purchase and read the advertising or the news of the papers upon which the piracy is committed, because, to some, the pirated news is stale by the time the newspapers are received and, as to others, the pirated matter is certain to be received by them, without paying for it, so soon after newspaper delivery. The charged unfair competition and piratical damage to the Associated newspapers' business and to their interest in the gathered news obviously

may deprive them of a portion both of their subscription payments and their advertising income.

KVOS presents other arguments, based on its affidavits on the motion for a preliminary injunction, purporting to sustain the dismissal of the bill with prejudice. They are not pertinent to the dismissal, and are later considered in connection with the motion to which they were addressed.

In its final analysis the argument of KVOS to sustain the dismissal rests on the proposition that the bill in International News Service v. Associated Press, supra, would have been dismissed by the Supreme Court if the International News Service's members then had had a much faster distribution of the pirated news and had relied entirely on advertising income from their papers; the appropriated news being presented free of charge to prospective customers of their advertisers, to some readers before and to others very shortly after the delivery time of the papers of the Associated Press' members, who had supplied the creative energy and the funds for the collection of the news.

(a) *Jurisdictional amount of claimed damage to complainant's business and to its interest in its gathered news.* The majority opinion of the Supreme Court in the case of International News Service v. Associated Press recognizes a quality in the latter's corporate structure and functioning that is sui generis. In the first sentence of the opinion it holds that the Associated Press is competing with a similar corporation, "in the gathering and distribution of news *and* its publication for profit in newspapers throughout the United States." (Italics inserted.) To be "competitors in the * * * publication [of news] for profit in newspapers throughout the United States" must mean that such membership corporation engages in its publication for profit in the newspapers of its associated members. The use of the conjunctive "and" before the words "its publication for profit" in describing the competition between the two parties in that litigation compels this interpretation. This peculiar integration of the corporate structure itself with the functioning of the newspapers which are associated in its membership, underlies the entire reasoning of the opinion. The profit-seeking business of the newspapers is there treated as an integral part of the corporate purpose. The several millions of dollars here alleged to be in-

vested in the Association's business may well be damaged to the extent of $3,000 by the pirating practices described.

This answers the suggestion that the corporation in gathering news and its distribution to its members receives no more compensation than its cost. However, even in this more confined area of the corporate interest, the absence of pecuniary profit would not mean that the corporation is not engaged in a business in which is created, by the gathering of news, a *real value* in excess of the amounts expended in its gathering. The fact of the long-continued existence of the Associated Press, with its excess of 1,000 members, shows that its corporate activities must create some added value in the gathering of the news it distributes to them.

Furthermore, in addition to the interest in the business as a going concern entitled to continue its creative processes, the Supreme Court has held that the association has an interest warranting protection *in the assembled news itself.* This interest the court defines as a "quasi property right" in the course of making its affirmative answer to the question which it framed as follows: "The question, whether one who has gathered general information or news at pains and expense for the purpose of *subsequent* publication *through the press* has such an interest in its publication as may be protected from interference, has been raised many times, although never, perhaps, in the precise form in which it is now presented." (Italics inserted.) International News Service v. Associated Press, 248 U.S. 215, 237, 39 S.Ct. 68, 71, 63 L.Ed. 211, 2 A.L.R. 293.

It is obvious that the business of gathering and distributing to members, *before* profitable publication, could conceivably be damaged to the extent of $3,000 by the misappropriation and premature publication of the news material. To hold otherwise would warrant the inference that no corporation could be damaged by a wrongful attack on its business, when that business happened to be run at no profit or at a loss. Also, we are unable to hold irrational the claim that the piracy caused a $3,000 damage to the Association's quasi property right in the news.

(b) *Diversity of citizenship.* Sufficient diversity of citizenship appears to sustain the jurisdiction. In the bill in the International News Service Case, no diversity appears except that between the two

associations. The citizenship of none of the members is alleged. As has been shown, the Supreme Court held in that case that a membership corporation which is a "competitor" of another in the "publication" of news "for profit" has sufficient interest to warrant its suing for injunctive relief against unfair competition. In addition, it may sue on behalf of its members. International News Service v. Associated Press, 248 U.S. 215, 233, 39 S.Ct. 68, 63 L. Ed. 211, 2 A.L.R. 293. If it had not been held specifically that the corporation itself had an interest in the competition of publishing for profit, the holding that the Associated Press could sue on behalf of its members, necessarily implied a right to sue on its own behalf. An agent cannot sue for equitable relief on behalf of a principal where the agency is bare of interest in the relief sought. This was held the rule in suits where one of a large group, similarly affected, sues on behalf of the others, in the early decision of Georgetown v. Alexandria Canal Co., 12 Pet. 91, 99, 9 L.Ed. 1012: "In this idea, we think they were in error; and that they cannot, upon any principle of law, be recognized as parties competent in court to represent the interests of the citizens of Georgetown. Nor is the difficulty obviated, by associating with them the citizens of Georgetown, as persons in whose behalf they sue. There are, indeed, cases, in which it is competent for some persons to come into a court of equity, as plaintiffs, for themselves and others having similar interests; such is the familiar example of what is called a creditors' bill. But in that, and all other cases of a like kind, the persons who, by name, bring the suit, and constitute the parties on the record, have themselves an interest in the subject-matter, which enables them to sue, and the others are treated as a kind of co-plaintiffs with those named, although they themselves are not named; but in this case, it has been already said that the appellants have no such interest as enables them to sue in their own name, and consequently, the whole analogy fails. Moreover, if the citizens of Georgetown were even parties on the record, the objection would equally lie against them, unless they could show a special damage as a ground to stand upon."

KVOS argues that because the International News Service opinion, 248 U.S. 215, at page 229, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293, holds that there had been a waiver of some question of parties,

the court meant a waiver of the requirement of parties *necessary to the jurisdiction*. Such a construction would require a reversal of the many decisions holding that diversity of citizenship, where necessary to jurisdiction, cannot be waived, and its absence requires dismissal by the Supreme Court. Chicago, B. & Q. Ry. Co. v. Willard, 220 U.S. 413, 420, 31 S.Ct. 460, 55 L.Ed. 521. Since the question of parties was called to the attention of the court in the International News Service Case, it must have considered that the Associated Press was sufficiently an interested adverse party to confer jurisdiction.

KVOS claims that among the many Association papers alleged to be circulated in the competing area, three are necessary parties because they are specifically alleged to be those from whom the news belonging to all the papers was pirated. As to one of them, the Bellingham Herald, it is asserted in the motion to dismiss that it "had been collusively omitted because its joinder would have destroyed complete diversity of citizenship." Such a pleading of what "would have" happened does not tender an issue of fact, but assuming that the joinder would have the claimed effect, the bill does not disclose that the Bellingham Herald is a citizen of Washington. If that could be a defense, it should be raised by answer. Equity Rule 29, 28 U.S.C.A. following section 723. Even if pertinent at this time, there is no evidence in the record as to the citizenship of the owner of that paper. We can see no reason why the specific mention of the three papers from which was pirated the news of all the Associated's members requires the joinder of any one of their owners, as a necessary or indispensable party. Their presence as parties is not required to prove the Association and all the members have been wronged by a misappropriation from some of them.

It therefore appears that the Associated Press has brought its case within the equitable jurisdiction of the federal courts and, if establishing its equity, is entitled to relief in its own right. This would be so even if among the group it represents there are members, not parties, who are citizens of the same state as the defendant. It was held in a class suit in Indiana, where Indiana members of the group were not parties, that not only was there federal jurisdiction, but the rights of the Indiana members were determined by the decree. Su-

preme Tribe of Ben-Hur v. Cauble, 255 U. S. 356, 366, 41 S.Ct. 338, 65 L.Ed. 673. True, any one of the three mentioned or, indeed, any of the members, might choose to intervene, but such intervention would not defeat the jurisdiction already acquired. Supreme Tribe of Ben-Hur v. Cauble, supra, 255 U.S. 356, 366, 41 S.Ct. 338, 65 L. Ed. 673, applying Stewart v. Dunham, 115 U.S. 61, 64, 5 S.Ct. 1163, 29 L.Ed. 329.

(c) *KVOS' business of publishing, by the broadcast of combined advertising and the pirated news, for the profit from its advertising income constitutes unfair competition with the newspapers' business of gathering the news pirated by KVOS and publishing it combined with the advertising, seeking the profit both from the advertising service and from the subscriptions of its readers. The papers are unconscionably injured in performing a public function as well as in conducting a legitimate business.*

■ KVOS lays great stress on the public interest in the news gathering and distribution and the public obligation of the gatherer and distributer, as likewise does the Associated Press. We believe these considerations have been properly pressed upon us. The First Amendment to the Federal Constitution has recognized this public function of the press in the provision for its freedom. While no constitutional right is here involved, this constitutional recognition emphasizes the exceptional character of the right which is sought to be protected in a federal court sitting in equity. When the Constitution speaks of the freedom of the press, it refers to the freedom of *private and nongovernmental persons or bodies,* engaged in news gathering and dissemination, from interference by governmental agencies. That is to say, that the public function in the gathering and dissemination of news *is presumed by the Constitution to be in private hands.*

Under our capitalistic system this means that news distribution as a public function will be in large part by businessmen acting under the inducement of the profit motive. The public therefore has an interest in protecting the business of news gathering and disseminating agencies against the impairment of their efficiency, by the inevitable reduction of their business income through the misappropriating of news prior to the expiration of the time during which the Supreme Court has held that there exists in it a "quasi property" interest. It is therefore proper to say that the Associated Press is here seeking protection not only of its legitimate business, but also, as both parties assert, in its discharge of a public function of fundamental value and importance.

The radio performs a function in the publication of news similar to that of the press. It has the advantage of greater speed and the disadvantage of the absence of a printed record for more deliberate absorption. If radio communication had been discovered in the Eighteenth Century, it is arguable that the businessman and others utilizing its process would have received in the First Amendment of the Constitution a recognition like that accorded the owners of newspapers. Congress has appreciated radio's importance and sought to make it effective against the confusion of distribution in the peculiar and little-understood medium through which it passes, by regulation of the use of wave lengths.

While this court takes judicial notice of radio's enormous business expansion, we cannot assume that its resources from its advertising income are not sufficient to support its own news-gathering agency, the "Radio News Association of New York." Even ignoring the question of good conscience in an equity tribunal, we can find nothing in the bill to warrant our holding that radio will fail in its public function of news distribution if it is not permitted to misappropriate the material gathered by an agency of the press.

So far as concerns the case against piracy presented by the bill, the speed of the radio's distribution of news makes the injury done the press in the performance of its business and civic activities the more effective and certain. Not only its speed, but its necessarily free publication, actually or potentially to every user of a radio set, make the more deadly its competition for the circulation of its advertising.

■ KVOS' motion to dismiss admits the pirated appropriation of the news, its circulation, and its destructive effect on the press. Its excuse is that it gives the material so obtained as a benefaction to its audiences, and that both the taking and circulation are so completely eleemosynary that this court *must* find, against the allegations of the bill, that the purloined news is in no way the defendant's weapon in its competition with the press for the patronage of advertising merchants.

Despite the ability with which counsel presented this argument, we are not persuaded that it has merit. Common sense compels us to agree with the complainant that the purloining of complainant's fresh news and its circulation in KVOS' "Newspaper of the Air" are both elements of a business of publication for profit. This profit is to be gained through widening its circulation at the expense of the circulation of the Associated papers. Complainant's news is not only made stale to those of their readers who first have access to the "Newspaper of the Air," but also is made free, while still hot, to their readers who pay a usual subscription price for their papers. The obvious tendency of these factors is to cause complainant's papers to lose circulation and with it the advertising income which is based on circulation. We are unable to see any theory under which such a diversion of advertising income from the Associated papers to KVOS, with its incidental destruction of subscriber income, can be called anything but "unfair competition."

A similar defense that a charged act was not a wrong, because it was not done for profit, was considered and disposed of in accord with our ruling here in the case of Herbert v. Shanley Co., 242 U.S. 591, 593, 37 S.Ct. 232, 233, 61 L.Ed. 511. The wrong charged was infringement of a copyright by a public performance of a musical composition, whereas we are considering the phase of this case involving impairment of a legitimate business by unfair competition. However, the difference in the wrong charged does not distinguish the ruling on the excuse for the wrong. In that case the music was performed by a restaurant orchestra, and it was claimed that it was "not a performance for profit," because there was no charge for it in the bills to the diners claimed to have had the pleasure of its entertainment. The court finds no merit in the defense in the following language: "The defendants' performances are not eleemosynary. They are part of a total for which the public pays, and the fact that the price of the whole is attributed to a particular item which those present are expected to order is not important. It is true that the music is not the sole object, but neither is the food, which probably could be got cheaper elsewhere. The object is a repast in surroundings that to people having limited powers of conversation, or disliking the rival noise, give a luxurious pleasure not to be had from eating a silent meal. If music did not pay, it would be given up. If it pays, it pays out of the public's pocket. Whether it pays or not, the purpose of employing it is profit, and that is enough."

So in the present case the publication of the pirated news "is not the sole object, but neither is the" advertising "which probably could be got cheaper elsewhere" if the news entertainment were omitted. If the news distribution "pays it pays out of the [advertisers'] pocket. *Whether it pays or not the purpose of employing it is profit and that is enough.*"

The Master of the Rolls in Sarpy v. Holland, 2 Ch. 1908, 198, 213, ruled adversely to a similar claimed excuse for a performance in a hotel of a musical composition, the rendition of which was expressly licensed "at entertainments which are absolutely free." The opinion holds: "Assuming that the license pleaded was proved, I feel no doubt whatever that it did not justify what was done. This performance was paid for by Mr. Holland, the publican, with a view of gain; it was worth his while to pay sixteen shillings a performance. It was obviously part of the means by which he attracted customers, and hoped to gain, and did gain, a profit in carrying on the business of an hotel. That being so, it seems to me impossible to contend that this was a performance at a gratuitous public entertainment."

We hold that the bill sufficiently alleges a controversy of equitable cognizance between citizens of different states and for relief for an amount of damages in excess of the jurisdictional requirement, and that the decree below ordering such a dismissal must be reversed.

█ (d) *The motion for a preliminary injunction should be granted.* This motion was submitted on affidavits. KVOS' affidavits, instead of denying competition with the association's papers in news circulation, insist that, through its own reporters and its news gathering agency, the Radio News Association with a personnel of 7,500 news gatherers and distributers, the news it circulates to its public is "live, hot, up-to-the-minute reports of news events of the nation and world as they happen from hour to hour, night or day." It insists that it could not use the Associated Press news service because "it does not supply news of that kind or character. On the contrary, if affiant should attempt to broadcast the news supplied by complainant Association,

affiant would, in the language used by the United States Senator Dill, the author of the Federal Radio Act [44 Stat. 1162], in a public address attacking the press associations' attitude towards radio, 'chloroform his radio listeners.' "

Supplementing its claims of the efficiency of its news circulation over that of the newspapers, it specifies certain news "scoops" in which its news-gathering agency has surpassed its rival agencies, and adds that "this action has been prompted *by competitive reasons* rather than for any meritorious purpose."

It appears from the uncontradicted affidavit of the manager of the Associated Press' press service in this area that KVOS "has filed with the proper authorities at Washington, D. C. its schedule of rates for advertising when such advertising is inserted in the course of its news broadcasts, as well as rates for advertising when not given during the course of such broadcasts, and it appears therefrom that the charges to such advertisers during the time that such news broadcasts are given is greater than at other times when such advertising is given over said radio station."

There can be but one conclusion from these uncontradicted facts. KVOS is competing with the press in its Newspaper of the Air, and the purpose of this competition is to procure the patronage of advertisers who will pay more for its circulation of advertising if it is intermingled with the articles of its Newspaper of the Air broadcasts.

Properly conducted, this is a description of a fair competition for advertising patronage, but as we have before suggested, it affronts common sense to claim that KVOS pays the salaries of its own local reporters and the considerable charge shown for the news supplied by its radio news gathering association, so yielding a higher price for the intermingled advertising, and that, despite this, the circulation of such news is a mere gift of an educational public service and not for the profit arising from the higher advertising rates.

These facts dispose of KVOS' further contention that the impressions created by radio circulation of news, on the minds of listening prospective customers of the advertisers, are too evanescent and vague to add appreciably to its competition for the patronage of advertisers using or likely to use the papers of the Associated Press.

The higher price for the advertising intermingled with news disposes of KVOS' contention that, since news distribution occupies but 10 per cent. of KVOS' broadcasting time, it is too unimportant an incident of its business to warrant equitable relief. The question is not one of percentage of time, but of the intensity of the interest aroused, and the intensity of the news attraction to advertising is demonstrated by the higher rate. In the International News Service Case it was not claimed that the pirated news occupied a major part of the news distributed by the International. On the contrary, it appeared that the piracy was principally confined to news from Great Britain, necessarily a small part of the total news published in its papers.

The question then remains whether, in what may well have been a legitimate business competition in the distribution of news for the accompanying profit, the competition was in part waged by KVOS' use against its opponents of their own news, pirated by it from the Associated Press.

KVOS relies on the testimony of L. H. Darwin, described in the affidavit of the owner of KVOS as employed "to conduct this program of news, and the said Darwin has full charge and the responsibility of that program." Manager Darwin's affidavit states that "affiant does not use the news of complainant or its member newspapers," and "further that at no time within the knowledge of Affiant has the Defendant Radio Station KVOS appropriated, pirated or used any news items belonging to Complainant, or the Bellingham Herald, or any other of its member papers."

The date of Manager Darwin's affidavit, November 28, 1934, is important. In response to these general denials of the pirating, complainant, two days later, filed the affidavit of two witnesses who testified that on November 14, 1934, that is, a fortnight before his general denials, Darwin himself had circulated by broadcast two Associated Press articles over KVOS. The text of the matter pirated by him, in the identical verbiage of the papers, is set forth in full detail, and the whole incident is described with particularity. It is not without significance, in considering other statements of KVOS' manager, that the particulars of this specific charge, so challenging the veracity of his statement that he "does not use the news of complainant

or its member newspapers," remain unanswered in the record. Such inaction does not enhance the good faith of the further contention that, despite the claimed superiority of the radio's national and local news gathering, it will be prevented in the performance of a public obligation if it is enjoined from appropriating and radioing to certain outlying communities the news gathered by the complainant, which news, KVOS claims, "would chloroform its radio listeners." Possibly the reason for not answering the charge against KVOS' manager is because his *two* appropriations of complainant's news are buried in the *180* similar appropriations specifically set out in the complainant's affidavits.

These 180 piratings occupy 385 pages of the printed record. The whole of each of complainant's articles is printed and the pirated portions indicated by capitals. A careful study shows that 153 of the appropriations are verbatim broadcasts of such substantial portions of the articles that, under no theory, could *any* have been composed by KVOS or its own news association. Eighty are from the "Seattle Times," 62 from the "Post Intelligencer," and 12 from the "Bellingham Herald." In the 153 articles were broadcast 425 identical paragraphs. Besides this there are many identical sentences containing the gist of other articles.

Had the remaining 27 broadcasts been offered alone, their similarity in composition conceivably could have been attributed to the explanation of KVOS' manager as to all the pirated broadcasts, that the similarity results "from the usual newspaperman's treatment of a common subject which contains the same elements of thought or sentiment." His attempt to explain in this manner the identical wording of the 425 paragraphs in the 153 appropriations is such a challenge to common intelligence that again KVOS' good faith is brought in question.

A study of the affidavits in the record of the International News Service Case shows that the preliminary injunction there granted was ordered sustained by the Supreme Court on a showing much less comprehensive and detailed than in the record here. Less than 30 instances of piracy are there described as compared with over 5 times that number here.

It appears, and it is not denied, that complainant's income from its distribution of its news to the papers serving KVOS' radio area is $6,000 per month, or $72,000 per annum. Since the 30 cases of piracy were sufficient to show a threatened damage warranting a preliminary injunction in the International News Service Case, the 153 are sufficient here. The Supreme Court there, without evidence of the loss of a subscriber, took notice that such a practice threatened harm to the circulation of the Association's member papers, requiring injunctive relief. We take similar notice here that such pirating may well affect both their subscriber and advertising income.

We see no merit in KVOS' contention that enjoining it from pirating complainant's news will deprive KVOS' auditors in more remote districts of anything to which they have a right. KVOS admits that from the matter gathered by its own news-gathering association and its own reporters, it supplies the public need for news in such districts with "the news events of the nation and world as they appear and happen by night and day as well as the interesting and popular local news items."

Concerning the affirmative defense that complainant's hands are stained by similar misappropriations of KVOS news by the "Bellingham Herald," one of its members, it is enough to say that KVOS' general charges are properly denied and, unlike KVOS, the one particular incident alleged is specifically and sufficiently explained as resulting from the similar working of the journalistic mind on the same news.

The decree is reversed, and the District Court ordered to grant a preliminary injunction restraining KVOS from appropriating and broadcasting any of the news gathered by the Associated Press for the period following its publication in complainant's newspapers during which the broadcasting of the pirated news to KVOS' most remote auditors may damage the complainant's papers' business of procuring or maintaining their subscriptions and advertising. In this connection, consideration should be given to the likelihood of KVOS' auditors awaiting the pirated news because it is free and does not require subscription for a newspaper.