## METRO ASSOCIATED SERV-ICES, Inc.

v.

## WEBSTER CITY GRAPHIC, Inc.
### Civ. No. 565.

United States District Court,
N. D. Iowa, Central Division.
Dec. 31, 1953.

Maxwell E. Sparrow, New York City, Stewart H. M. Lund (of Lund & Lund), Webster City, Iowa, for plaintiff.

Max M. Hemingway and Whitley M. Hemingway (of Burnstedt, Hemingway & Hemingway), Webster City, Iowa, for defendant.

GRAVEN, District Judge.

The plaintiff, Metro Associated Services, Inc., in this action charges the defendant, the Webster City Graphic, Inc., with violation of copyrights and unfair competition. The complaint is in nine counts. The first eight counts relate to violation of copyrights and the ninth count relates to unfair competition. Jurisdiction as to the first eight counts is based upon Section 1338(a), Title 28, U.S.C.A., and as to the ninth count upon Section 1338(b), Title 28, U.S.C.A. The plaintiff is a New York Corporation which provides newspapers and other periodicals with illustrations and other materials for use in connection with advertising. Its service is nation-wide. It will be hereafter referred to as Metro. During the times here material William Schak, frequently referred to in the record as Schak, was the General Manager of Metro. Metro publishes the "Metro Newspaper Service" hereafter referred to as the Metro Service. The Metro Service, which is published monthly, is a large, bound, slick-paper booklet, the pages of which are approximately 17 inches by 22 inches. Each issue consists of approximately 50 pages. Each page contains from 10 to 30 or more illustrations, advertising headings or combinations of those with a mat number for each illustration. During the period of time here involved approximately 50,000 illustrations appeared in the Metro Service. The Metro Service is subscribed to by approximately 3,500 newspapers. A newspaper which subscribes to the Metro Service makes use of the illustrations and other advertising materials in preparing advertisements for its advertisers. It appears that it is common practice for such subscribers to allow its advertisers to examine the Metro Service for suitable illustrations. When an illustration has been selected for use in an advertisement, the subscribing newspaper selects the mat for that illustration from the set of mats accompanying the printed volume and reproduces the illustration from the mat by ordinary printing processes. Metro sells its service to only one newspaper in a locality. This is done to avoid duplicate publication of the same illustration in the same locality and to induce newspapers to subscribe because of the resulting exclusive use of the Metro Service. The subscriptions are on a yearly basis. The standard Metro subscription contract, which is used by Metro generally and which was used by it in its contracts with the particular subscribers here involved, contains the following clause: "We are to have exclusive use of said service in the city of —————— and shall not use, loan or sell service, or any part thereof, outside of the territory." The Metro copyright symbol, generally printed along with a mat number beneath each illustration in the Metro Service, consists of a small "c" in a circle surmounted with a capital "M".

The defendant, Webster City Graphic, Inc., is an Iowa corporation engaged in the publishing business at Webster City, Iowa. Since March, 1951, it has published a newspaper known as the Webster City Graphic. The defendant and its publication are hereafter referred to as the Graphic. William L. Matthew has been the President and General Manager of the Graphic since its inception. All of the stock in the defendant is owned by him and the members of his family. He is hereafter referred to as Matthew. For many years prior to March, 1951, and since that time there has been a daily paper published at Webster City, Iowa, known as the Webster City Freeman-Journal, hereafter referred to as the Freeman-Journal. For a period of time prior to March, 1951, Matthew was in the employ of the Freeman-Journal as Advertising Manager. During all of the period of time here material the Freeman-Journal was the exclusive subscriber to the Metro Service in Webster City. On January 19, 1950, and February 13, 1951, Matthew, in his capacity as Advertising Manager of the Freeman-Journal, signed annual subscriptions with Metro. Matthew was familiar with the Metro Service

and its exclusive use feature. Shortly prior to March 1, 1951, Matthew left the employ of the Freeman-Journal and started the Graphic. The Graphic is printed by "photo-offset" process rather than by conventional printing methods made use of by most newspapers, including the Freeman-Journal. Conventional printing methods require the use of mats for illustrations. The "photo-offset" method does not necessitate the use of mats for the printing of illustrations. The Graphic began as a weekly, delivered or mailed free of charge to residents of Webster City and surrounding area. It has developed into a semi-weekly paper carrying some local news and some features. Its circulation exceeds that of the Freeman-Journal. The Graphic is in competition with the Freeman-Journal for advertising, and its advertising rates are lower than those of the Freeman-Journal. The Graphic has not at any time been a subscriber to Metro Service.

During the period of time here material, the Graphic was a subscriber to a specialized service known as the Multi-Use Ad Builder, published by Multi-Ad Services, Inc., of Peoria, Illinois. The publisher and the publication will be hereafter referred to as Multi-Ad and the Multi-Ad Service. The Multi-Ad Service is similar to the Metro Service except that it provides its subscribers with borders, headings, and "attention compellors" rather than with actual advertising illustrations. The Multi-Ad Service furnishes mats to its subscribers. The Graphic, not needing mats because it printed by "photo-offset," merely cut out the desired material from the Multi-Ad Service. Commencing in 1945 Metro had given Multi-Ad permission to demonstrate the use of Multi-Ad's borders and headings with illustrations from Metro Service. This permission was given upon the condition that each page on which the Metro illustrations were used should carry a warning that only those Multi-Ad subscribers who were also subscribers to Metro Service could avail themselves of the Metro il-lustrations. As a practical matter this warning was needed only as to those Multi-Ad subscribers who printed by "photo-offset" since Multi-Ad did not furnish mats for the Metro illustrations and the cost to those newspapers which were printed by conventional means of reproducing Metro's illustrations without mats would not be economically feasible. Multi-Ad agreed to the condition specified by Metro in connection with the use of Metro material. When any Metro material appeared in Multi-Ad the Metro symbol appeared below the item used and on the same page in the lower right hand corner there appeared the following: "Material from the Metro Service which appears on this page is available to Metro Subscribers only." Matthew did not know that Metro material was appearing in Multi-Ad until his attention was specifically called to it by Schak of Metro following a claimed copyright infringement by the Graphic. The Metro material was the proper subject of copyright and all of the material here involved was copyrighted. From the numerous pages of newspapers introduced into evidence in this case it appears the material was of the type and kind used generally in advertisements. Metro does not copyright each illustration separately but by notice and subsequent registration secures a copyright for each monthly issue of Metro Service.

In Count One of its complaint the plaintiff charges the defendant with copyright infringement in connection with the use of the illustration which was accompanied by the words "Come To The Fair." That illustration with the accompanying words appeared in the Metro Service of July, 1951. That issue was copyrighted by the plaintiff. Webster City is located in Hamilton County, Iowa. In July, 1951, the Freeman-Journal published a booklet for the Hamilton County Fair Association known as the Hamilton County Fair Book. The Freeman-Journal made use of the illustration and accompanying words. It was published by that newspaper without the

Metro symbol and without any notice of copyright. The Fair Association had not placed any advertisements for the fair in the Graphic. Matthew of the Graphic spoke to the Secretary of the Fair Association about it. The Secretary of the Fair Association authorized Matthew to run an advertisement of the fair and gave Matthew the Fair Book which had been published by the Freeman-Journal and told him to select whatever material he wished for the advertisement. Matthew selected the illustration with the accompanying words "Come To The Fair" and used it in connection with an "unpaid filler" advertisement for the fair published in the issue of the Graphic of August 29, 1951. That publication by the Graphic is the basis for Count One. At the time the illustration was published Matthew did not know the illustration had come from the Metro Service. On September 7, 1951, and on November 14, 1951, Schak of Metro wrote Matthew claiming infringements of Metro's copyrights by the Graphic. By letter dated November 23, 1951, Matthew answered Schak and admitted two infringements of the Metro Service. Matthew then had the erroneous impression that the illustration in question was part of the Metro material which had appeared in Multi-Ad and that the Graphic had taken the illustration from Multi-Ad without noticing it was Metro material. It does not appear that the illustration in question ever appeared in Multi-Ad, and it finally was ascertained that the illustration had come from the Fair Book.

In Count Two of its complaint the plaintiff charges the defendant with copyright infringement in connection with an illustration "Let's Talk Turkey." The illustration consisted of those words printed in a distinctive manner. It was published in the Metro Service of November, 1950. That issue was copyrighted by the plaintiff. The Ames Daily Tribune published at Ames, Iowa, published the illustration in its issue of December 19, 1950, without the Metro symbol and without any notice of copyright. That newspaper was a subscriber to the Metro Service. The illustration was published in the September, 1951, issue of Multi-Ad Service with the Metro symbol printed beneath it and with a legend in small type in the lower right hand corner of the page containing it, stating "Material from the Metro Service which appears on this page is available to Metro Subscribers only." Shortly prior to November 7, 1951, a Mr. Fischer, the proprietor of a meat market in Webster City and a regular advertiser in the Graphic, desired to place an advertisement in the Graphic. He will hereafter be referred to as Fischer. Fischer consulted with James Michelson, a "layout artist" for the Graphic, as to the proposed advertisement. Michelson did not ordinarily take advertising for the Graphic, but he did from time to time assist Fischer with his advertisements. The Graphic had issues of Multi-Ad Service available, including the issue of September, 1951, containing the illustration "Let's Talk Turkey" from the Metro Service. Michelson and Fischer went over the Multi-Ad issues and selected that illustration for use in connection with Fischer's advertisement. Fischer's advertisement containing the illustration was published in the Graphic on November 7, 1951. That publication by the Graphic is the basis of Count Two. Matthew had previously warned Michelson that he could not use Metro material. Matthew did not know that the illustration taken from Multi-Ad came from the Metro Service. On November 14, 1951, and on November 20, 1951, Schak of Metro wrote Matthew claiming infringements of Metro's copyrights by the Graphic.

In Counts Three and Four of its complaint the plaintiff charges the defendant with copyright infringement in connection with an illustration, "Turkeys, Ducks and Chickens." The illustration consisted of those and related words printed in a distinctive manner. The illustration was published in the Metro Service of November, 1950. In

that issue each of the words carried the Metro symbol and there was a mat for each word. That issue was copyrighted by the plaintiff. On November 16, 1950, the illustration was published in the Freeman-Journal without the Metro symbol and without any notice of copyright. It was published in connection with an advertisement of Mr. Fischer, the proprietor of a meat market in Webster City. He is the same Mr. Fischer who was referred to in connection with the claimed copyright infringement charged in Count Two. On November 20, 1950, that portion of the illustration consisting of the words "Turkeys" and "Chickens" was published in the Ames Daily Tribune at Ames, Iowa, without the Metro symbol and without any notice of copyright. The Ames Daily Tribune was at the time a subscriber to the Metro Service. The illustration was published in the September, 1951, issue of Multi-Ad Service with the Metro symbols beneath the words and with a legend in small type at the lower right-hand corner of the page stating, "Material from Metro Service which appears on this page is available to Metro Subscribers only." Shortly prior to November 14, 1951, Fischer came to James Michelson, the "layout artist" of the Graphic. Fischer brought with him the advertisement he had run in the Freeman-Journal the year before. That advertisement contained the illustration "Turkeys, Ducks and Chickens." He asked Michelson to reproduce the advertisement for publication in the Graphic. Michelson reproduced the advertisement and it was published in the Graphic on November 14, 1951. That publication is the basis of Count Three. The same advertisement was published in the Graphic on December 19, 1951. That publication is the basis of Count Four of the plaintiff's complaint. On November 20, 1951, Schak of Metro wrote Matthew warning generally as to infringements and charging that on November 14, 1951, the Graphic published "some captions" in an advertisement for "Swartz." The

"Swartz" advertisement contained no Metro material and Matthew was not then aware of any controversy as to the Fischer advertisement.

In Count Five of the plaintiff's complaint the plaintiff charges the defendant with copyright infringement in connection with an illustration referred to as "Linoleum." The illustration portrayed rolls of linoleum. It also contained some text. The illustration appeared in Metro Service of January, 1952. That issue was copyrighted by the plaintiff. The Boone News-Republican published at Boone, Iowa, published the illustration on February 14, 1952, without the Metro symbol and without any notice of copyright. That newspaper was a subscriber to Metro Service. One Mr. Chapman was the proprietor of the Chapman Furniture Company of Webster City. On February 25, 1952, the illustration was published by the Freeman-Journal without the Metro symbol and without any notice of copyright in an advertisement for the Chapman Furniture Company. Shortly prior to March 26, 1952, a Mr. Frederickson, an advertising salesman, consulted Mr. Chapman for an advertisement in the Graphic. Mr. Chapman agreed to purchase an advertisement in the Graphic and gave Mr. Frederickson a copy of the "Linoleum" illustration to be used in connection with the advertisement. The illustration did not have any copyright symbol or copyright notice on it. Mr. Chapman was under the impression that the illustration was one which had been sent him by a linoleum supplier. However, it came from a copy of the advertisement in the Freeman-Journal furnished to Mr. Chapman by it. On March 26, 1952, the "Linoleum" illustration was published in the Graphic as a part of the Chapman Furniture Store advertisement. This publication is the basis of Count Five of the plaintiff's complaint. At the time of its publication neither Mr. Chapman nor Mr. Frederickson nor anyone connected with the Graphic knew that the illustration had appeared in the Metro Service.

In Count Six of the plaintiff's complaint the plaintiff charges the defendant with copyright infringement in connection with illustrations known as the "Dollar Days" illustrations. Two illustrations with a frame suggestive of the outer border of a dollar bill, identical except for size, were published in the Metro Service of July, 1952. The same issue contained an illustration portraying a young woman in a summer dress. These three illustrations are known as the "Dollar Days" illustrations. The Perry Daily Chief of Perry, Iowa, published the "Dollar Days" illustrations on July 30, 1952, in an advertisement for "Woodward's" store in Perry, Iowa. The Perry Daily Chief was a subscriber to the Metro Service. In this advertisement the Metro symbol was not printed beneath the smaller "dollar" frame. The symbol appeared within the border of the larger "dollar" frame. The symbol was obscure. The Metro symbol had been removed from the illustration of the young woman. A tear sheet containing this advertisement was sent by "Woodward's" store in Perry to Mr. Mason, the manager of "Woodward's" store in Webster City. Mr. Mason clipped the "Woodward's" advertisement from the tear sheet from the Perry Daily Chief and gave it to Matthew to be run as an advertisement in the Graphic. The advertisement with the dollar frame and the young woman illustrations was published by the Graphic on August 14, 1952. That publication is the basis of Count Six of the plaintiff's complaint. At the time of the publication neither Mr. Mason nor Matthew nor any one connected with the Graphic knew that the illustration had come from the Metro Service.

In Count Seven of its complaint the plaintiff charges the defendant with copyright infringement in connection with an illustration known as the "Community Chest" illustration. That illustration portrayed a man reading a newspaper accompanied by the words "Community Chest" and "Give." That illustration was published in the Metro Service of October, 1951. That issue was copyrighted by the plaintiff. The Fremont Guide and Tribune published at Fremont, Nebraska, published the illustration on October 20, 1951, without the Metro symbol and without any notice of copyright. The Fremont Guide and Tribune was a subscriber to the Metro Service. A Mr. Hill of Webster City had formerly lived at Fremont, Nebraska, and was a subscriber to the Fremont Guide and Tribune. Mr. Hill was a director of the Webster City Chamber of Commerce in the fall of 1952 and was assisting in the Webster City Community Chest Drive. Mr. Hill clipped the "Community Chest" illustration from the Fremont Guide and Tribune and gave it to Matthew and requested that it be printed in the Graphic. The illustration was published in the Graphic on November 10, 1952. This publication is the basis of Count Seven of plaintiff's complaint. At the time of the publication neither Mr. Hill nor Matthew nor any one connected with the Graphic knew that the illustration had come from the Metro Service.

In Count Eight of its complaint the plaintiff charges the defendant with copyright infringement in connection with illustrations known as the "Wrestling" illustrations. The illustrations portrayed two wrestlers in a wrestling grapple. The only difference in the illustrations was as to size. The illustrations appeared in Metro Service of February, 1944. That issue was copyrighted by the plaintiff. Some time prior to November 21, 1951, the Freeman-Journal printed a quantity of handbills advertising a wrestling show being held under the auspices of the Webster City Chamber of Commerce. The handbills contained one of the "Wrestling" illustrations. The illustration was printed by the Freeman-Journal without the Metro symbol and without any notice of copyright. The Secretary of the Webster City Chamber of Commerce took one of the handbills to Matthew and asked that it be run as an advertisement in the Graphic. It was published in the

Graphic on November 21, 1951. At the time of the publication neither the Secretary of the Webster City Chamber of Commerce nor Matthew nor any one connected with the Graphic knew that the illustration had come from the Metro Service.

During the period of time here material neither Matthew nor any one connected with the Graphic had any access to the Metro publications here involved and none of the illustrations here involved were copied directly from the Metro Service. Neither Matthew nor any one connected with the Graphic had actual knowledge that any of the illustrations came from the Metro Service until after publication. Neither Matthew nor any one else connected with the Graphic at any time represented to any one that the Graphic was authorized to use material from the Metro Service. Metro requested that the newspapers subscribing to its service send it the pages from their newspapers in which Metro material appeared. Those pages are known and referred to as tear sheets. A considerable number of such tear sheets containing advertisements in which Metro illustrations were used were put in evidence by the parties. The tear sheets introduced by the plaintiff showed that the Metro symbol was printed in connection with the illustrations. The tear sheets introduced by the defendant showed that the Metro symbol had been omitted from the illustrations. Newspaper publishers who were subscribers to the Metro Service testified as to their practice in the matter of publishing the Metro symbol in connection with the publication of Metro illustrations. They testified that it was their practice to remove the Metro symbol from the mat except in cases where the symbol appeared in the border of an illustration and could not be removed without marring the illustration.

Each of the issues of Metro Service here involved was properly copyrighted under 17 U.S.C.A. § 5(b), and the component parts of the service and the illustrations were properly separately copyrighted under 17 U.S.C.A. § 5(k), and as such are within the terms of 17 U.S.C.A. § 3. Each illustration here involved was protected by the copyright of the whole service. Therefore, the unauthorized publication of any one of the illustrations while the copyright was still subsisting would constitute an infringement even though the illustration involved might bear a minute proportion to the whole of the Metro Service. The "material and substantial" test of copyright infringement is not applicable to individual items coming under 17 U.S.C.A. § 3. Markham v A. E. Borden Co., 1 Cir., 1953, 206 F.2d 199. As to the "material and substantial" test see Toksvig v. Bruce Pub. Co., 7 Cir., 1950, 181 F.2d 664, 667. The situation is that each of the illustrations here involved was properly copyrighted by the plaintiff and each was subsequently published by the defendant without authorization. The question presented is whether any intervening event or events operated to effect a dedication to the public by the plaintiff of those illustrations. It is the defense of the defendant that such dedication was effected. If there was no intervening dedication and the Metro copyright was still subsisting as to a particular illustration at the time it was published by the Graphic, such publication would constitute an infringement of the plaintiff's copyright by the defendant. This would be true despite the fact that the defendant was without knowledge of plaintiff's copyright at the time it published the illustrations in question. "Intention is immaterial if infringement appears." Toksvig v. Bruce Pub. Co., 7 Cir., 1950, 181 F.2d 664, 666; De Acosta v. Brown, 2 Cir., 1944, 146 F.2d 408, 411, certiorari denied, 1945, 325 U.S. 862, 65 S.Ct. 1197, 89 L.Ed. 1983. Lack of intent to violate another's copyright does not excuse one from liability for so doing. Advertisers Exchange, Inc., v. Hinkley, D.C.Mo.1951, 101 F.Supp. 801, affirmed, 8 Cir., 1952, 199 F.2d 313, certiorari denied, 1953, 344 U.S. 921, 73 S. Ct. 388, 97 L.Ed. 710.

■■ When published singly in an advertisement an illustration from the Metro Service is a copyrightable printed advertisement, 17 U.S.C.A. § 5(k). Every reproduction of a copyrighted item must under Section 10, 17 U.S.C.A., bear the statutory notice. Deward & Rich, Inc., v. Bristol Savings & Loan Corporation, 4 Cir., 1941, 120 F.2d 537. Section 19 of 17 U.S.C.A. prescribes the form of notice of copyright. The pertinent portion of that Section provides as follows:

"The notice of copyright required by section 10 of this title shall consist either of the word 'Copyright' or the abbreviation 'Copr.', accompanied by the name of the copyright proprietor, * * *. In the case, however, of copies of works specified in subsections (f) to (k), inclusive, of section 5 of this title, the notice may consist of the letter C enclosed within a circle, thus ©, accompanied by the initials, monogram, mark, or symbol of the copyright proprietor: *Provided,* That on some accessible portion of such copies * * * his name shall appear. * * *"

In the case of Booth v. Haggard, 8 Cir., 1950, 184 F.2d 470, 471, the United States Court of Appeals for this Circuit stated "To be legally effective the notice must satisfy the prescriptions of the statute."

At the trial the plaintiff introduced a considerable amount of evidence bearing upon the matter of the presence or absence of the Metro symbol in connection with the publication of Metro illustrations by its subscribers and devoted a portion of its argument to that matter. It is apparently the contention of the plaintiff that the publication of the Metro symbol in connection with the publication of its illustrations by its subscribers constituted proper and legal notice of copyright. In the case of Goes Lithographing Co. v. Apt Lithographic Co., Inc., D.C.N.Y.1936, 14 F.Supp. 620, the situation was that the plaintiff who was the owner of a copyrighted picture

entitled "Found" published the picture with a small "c" in a circle. The initials of the plaintiff appeared in the circle but the plaintiff's name as copyright proprietor did not otherwise appear. The Court stated in 14 F.Supp. at page 621: "By the statute the notice must disclose the identity of the proprietor. * * * I agree that the statute should be applied without undue rigidity as to the proprietor's name in the notice. But the proprietor's name must be declared in some fashion, and here there is no name." The Court dismissed the plaintiff's action. In the case of Smith v. Bartlett, D.C.Me.1937, 18 F.Supp. 35, the plaintiffs were the copyright proprietors of a work containing cartoons intended for use in connection with advertisements by those subscribing to their service. Those subscribing to their service received cuts of the cartoons to be used by the subscribers for the publication of the cartoons. The cuts contained a small circle with the letter "c" inside. The plaintiff's initials appeared in the circle but the names of the plaintiffs as copyright proprietors did not otherwise appear. The cartoons were published by a subscriber of plaintiffs with only the circle and the encircled letters appearing thereon. The defendant innocently came into the possession of one of the cuts and published the cartoon which was portrayed by the cut without knowledge of the plaintiffs' copyright. The Court stated in 18 F.Supp. at page 37:

"* * * Copyright holders are given certain monopolistic rights by statute, but they can be maintained only by complying with the terms of the statute, which provides, as to notice, for the benefit and protection of third persons, that the notice of copyright shall be affixed to each copy published or offered for sale in the United States by authority of the copyright proprietor, the required notice to contain either the word 'copyright' or its abbreviation, accompanied by the name of the proprietor or, if the work comes within the category of drawings, photo-

graphs, prints, or pictorial illustrations, it may consist of the letter 'c' inclosed within a circle, accompanied by the initials, monogram, mark, or symbol of the copyright proprietor; but, in that case, the name of the proprietor must appear 'on some accessible portion of such copies or of the margin, back, permanent base, or pedestal, or of the substance on which such copies shall be mounted.' U.S.C.A., title 17, §§ 9 and 18.

" 'The provisions of the statute, as to notice, must be complied with in making and selling a copyrighted article, or otherwise there is a dedication to the public and the copyright protection is lost.

" ' "Publication with notice of copyright is the essence of compliance with the statute, and publication without such notice amounts to a dedication to the public sufficient to defeat all subsequent efforts at copyright protection." Universal Film Mfg. Co. v. Copperman, D.C., 212 F. 301.' Fleischer Studios v. [Ralph A.] Freundlich [Inc.] 2 Cir., 73 F.2d 276, 277."

The copyright symbol of the plaintiff in the present case, as heretofore noted, consisted of a small "c" in a circle surmounted by a capital "M". It is the holding of the Court that such symbol appearing without the name of the plaintiff as copyright proprietor does not meet and fulfill the statutory requirements as to notice of copyright.

■ The plaintiff conceded that its name as the copyright proprietor was never printed by any of its subscribers in connection with their publication of Metro illustrations. That means that the plaintiff knew that none of its 3,500 subscribers were publishing its name as the copyright proprietor in connection with the publication of Metro illustrations. The standard form of subscription contract used by the plaintiff contained no provision relating to the publication of the Metro symbol or its name as copy-

right proprietor in connection with the publication of Metro illustrations. There is no evidence that the plaintiff ever requested or advised its subscribers to publish its name as the copyright proprietor of the Metro illustrations, and the plaintiff does not claim that it did. The plaintiff's subscribers were authorized to publish the Metro illustrations and there is no claim on the part of the plaintiff that the publication by its subscribers of Metro illustrations without the name of the plaintiff appearing in connection therewith as the copyright proprietor was an unauthorized form of publication. Further, the mats furnished by the plaintiff to its subscribers for publishing Metro illustrations did not contain the name of the plaintiff on the portions designed to be used for publication. The obvious conclusion would seem to be that plaintiff's subscribers were authorized to publish Metro illustrations in the form provided by the mats. It must be concluded and it is concluded and found that the publication of the Metro illustrations here involved by plaintiff's subscribers without the name of the plaintiff appearing "on some accessible" portion was "by authority" of the plaintiff. Each illustration here involved prior to its publication by the Graphic had been previously published by a newspaper which was a subscriber to the Metro Service without the name of the plaintiff appearing as the copyright proprietor. It is the holding of the Court that such publication effectuated a dedication to the public of those illustrations. It should be noted that all the illustrations here involved save one, prior to its publication in the Graphic, had previously been published without even the Metro symbol by a newspaper which was a subscriber to the Metro Service. The one exception was the so-called "Dollar Days" illustrations referred to in Count Six. In the "dollar" frame illustration used in the "Woodward's" store advertisement published by the Perry Daily Chief, a very small Metro symbol appears obscurely in the border of the frame. The Metro Service of July, 1952, sets

forth "Ad Ideas" which consisted of a display of illustrations from that issue in a format suitable for a full page newspaper advertisement. In the suggested form of advertisement the Metro symbol had been uniformly removed, even from the "Dollar Days" dollar frame discussed in connection with Count Six.

The plaintiff apparently claims that even though notice by copyright symbol did not meet the statutory requirements, yet it could be sufficient as to one experienced in advertising and familiar with its material and symbol. That claim is based upon the assumption that Matthew of the Graphic had such a background that he could identify any one or more of the 50,000 illustrations published by Metro during the period of time in question even when published "unmarked," as were all but one of the illustrations here involved. That claim as to the one illustration involved in which the Metro symbol appeared in the previous publication is based upon the assumption that those who were connected with the Graphic had actual knowledge of the Metro symbol which appeared obscurely in the border of one of the "Dollar Days" illustrations. The record does not sustain either assumption. The plaintiff claims that even though those connected with the Graphic did not actually know that the illustrations involved were Metro illustrations, yet the circumstances were such as to put them on notice and make it their duty to ascertain the situation as to copyright. The case of Mifflin v. R. H. White Co., 1903, 190 U.S. 260, 23 S.Ct. 769, 771, 47 L.Ed. 1040, 1043, involved a similar question. In that case the defendant, a publisher, was sued for copyright infringement for the unauthorized publication of some writings of Oliver Wendell Holmes which had appeared in a copyrighted issue of the Atlantic Monthly. There were a number of questions involved. The issue did not carry the name of Dr. Holmes as the copyright proprietor and the notice was held to be a defective notice. The plaintiff contended that even though the copy-

right notice was defective yet the fame and reputation of Dr. Holmes was such that the defendant was put on notice to make inquiry as to the copyright situation. The United States Supreme Court rejected that contention, stating, 190 U. S. at page 264, 23 S.Ct. at page 771: "It is incorrect to say that any form of notice is good which calls attention to the person of whom inquiry can be made and information obtained, since, the right being purely statutory, the public may justly demand that the person claiming a monopoly of publication shall pursue, in substance, at least, the statutory method of securing it." A copyright notice which does not comply in substance with the statutory requests is legally ineffective. A copyright notice which is legally ineffective is not rendered legally effective as to a particular alleged infringer by the fact that the circumstances were such as to afford such alleged infringer actual knowledge of the copyright or by the fact that the circumstances were such as to direct his attention to sources from which information as to the copyrights might be obtained. The publication of copyrighted material without the statutory notice of copyright vitiates the copyright of it and renders it public property. Mifflin v. Dutton, 1903, 190 U.S. 265, 23 S.Ct. 771, 47 L.Ed. 1043. The strictness of the rule is exemplified by the cases of Booth v. Haggard, 8 Cir., 1950, 184 F.2d 470; Group Publishers, Inc. v. Winchell, D.C. N.Y.1949, 86 F.Supp. 573, and Wildman v. N. Y. Times Co., D.C.N.Y.1941, 42 F.Supp. 412. In the case of Group Publishers, Inc. v. Winchell, copyright protection of a publication was held to have been lost because the name of the assignee of the copyright was given in the notice as proprietor before the recordation of the assignment. The Court stated in 86 F.Supp. at page 577: " * * * failure fully to conform to the form of notice prescribed by the act results in abandonment of the right and a dedication of one's work to the public. * * * The Congressional policy reflected in the statute is that the notice

of copyright shall contain, as proprietor, the name of the holder of record; * * *." In the case of Wildman v. New York Times Co., the plaintiff was held to have lost his copyright protection of a poem because the copyright notice omitted the date of the copyright although sufficient in all other respects. The Court stated in 42 F.Supp. at page 414: "Publication with notice of copyright is the essence of compliance with the statute, and publication without proper notice amounts to a dedication to the public sufficient to defeat all subsequent efforts at copyright protection." In the case of Booth v. Haggard, it was held that publication of the copyright notice on the third page of a booklet instead of on the title page or on the page immediately following as specified by Section 20 of 17 U.S.C.A. resulted in loss of copyright protection.

Copyright protection of advertising is of comparatively recent origin. The first case in which copyright protection was given an advertisement is the case of Bleimtein v. Donaldson Lithographing Co., 1903, 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460. That case involved a circus poster portraying people connected with the circus and circus acts. The plaintiffs had complied with the statutory provisions as to copyright. When they sued the defendant for infringement of copyright in connection with the poster he set up the defense that it was not the subject of copyright. The United States Court of Appeals for the Sixth Circuit, Courier Lithographing Co. v. Donaldson Lithographing Co., 104 F. 993, upheld that defense. The decision of that Court was reversed by the United States Supreme Court which held that the material contained in the advertisement was a proper subject for copyright. Two Justices dissented. The majority opinion was written by Justice Holmes. It is now well settled that advertisements are a proper subject of copyright. An interesting and informative law review article on copyright of advertising is "Copyright of Advertising" by Mary Garner Borden, 35 Kentucky Law Journal 205 (1947). The author states that copyright is not often sought for advertisements.

In Count Nine of its complaint the plaintiff charges the defendant with unfair competition in publishing the seven illustrations here involved. In the case of Heuer v. Parkhill, D.C.Ark. 1953, 114 F.Supp. 665, at page 670, in which the plaintiffs charged the defendant with simulation of their folder advertisements, the Court set forth the law relating to copying of advertising material as follows:

" 'The general rule is that the appropriation of another's advertising matter or method is not of itself unfair competition, although it may become such where it induces or may induce the public to suppose that in dealing with the appropriator they are dealing with or obtaining the product or services of the originator * * *'. 52 Am.Jur., Trademarks, Tradenames, and Trade Practices, Section 116, Page 595.

" 'Unfair competition begins where imitation results in the deception of the customers of the party complaining.' International Heating Co. v. Oliver Oil Gas Burner & Machine Co., 8 Cir., 288 F. 708, 711, 30 A.L.R. 611.' "

The plaintiff and the defendant are not in competition. Each deals with wholly different and independent groups of customers who are purchasing dissimilar things. The defendant did not represent that it was the plaintiff or a subscriber to plaintiff's service or authorized to use plaintiff's material. However, there is another phase of unfair competition. The systematic appropriation of another's uncopyrighted work product constitutes unfair competition. International News Service v. Associated Press, 1918, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211. In that case the United States Supreme Court held that the systematic appropriation by one news

service of the news items of another news service would be enjoined. The doctrine of that case has been referred to as the "free ride" doctrine. Copyright of Advertising, supra, p. 209. See also Associated Press v. KVOS, 9 Cir., 1934, 80 F.2d 575, certiorari denied, 1936, 298 U.S. 650, 56 S.Ct. 938, 80 L.Ed. 1379. While, as heretofore noted, lack of intent is immaterial where a copyright has been infringed, yet intent is one of the matters that may be considered where unfair competition is charged. There may also be considered in that connection whether the conduct complained of has been regular, systematic, and deliberate in character. The feature of knowledge or lack of knowledge on the part of the claimed offender of the ownership of the items claimed to have been wrongfully appropriated is of importance. In the present case the publication of Metro's illustrations by the Graphic was irregular and inadvertent. At the time the publications in question were made, the defendant did not know that the illustrations used were Metro illustrations. There has not been and there is not now any intent on the part of the defendant to appropriate Metro illustrations. The situation of which the plaintiff complains was largely occasioned by the plaintiff authorizing or acquiescing in the publication of its illustrations without notice of ownership or indication as to their source. The record does not sustain the charge that the defendant has been guilty of unfair competition and the Court finds that the defendant has not been guilty of unfair competition.

It Is Ordered that judgment be entered in favor of the defendant. Under the provisions of Section 116 of 17 U.S.C.A., a reasonable attorney's fee may be made to the prevailing party in a copyright infringement action. Such an award is discretionary with the Court. Toksvig v. Bruce Pub. Co., 7 Cir., 1950, 181 F.2d 664, 668. This Court is of the view and holds that no award of attorney's fee should be made to the defendant.