**UNITED STATES of America,
Appellee,**

v.

**PIPEFITTERS LOCAL UNION NO. 562,
etc., et al., Appellants.**

**No. 19466.**

United States Court of Appeals,
Eighth Circuit.

June 8, 1970.

Dissenting Opinion July 17, 1970.

**1118**

Murry L. Randall, St. Louis, Mo., for appellants and filed brief. The following attorneys were on the brief with Mr. Randall: Richard L. Daly, James F. Nangle, Jr., John L. Boeger, Cordell Siegel, and Norman S. London, St. Louis, Mo.

Edgar N. Brown, Atty., Dept. of Justice, Washington, D. C., for appellee; Will Wilson, Asst. Atty. Gen., Dept. of Justice and Jerome M. Feit, and Robert J. Rosthal, Attys., Dept. of Justice and Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., were on the brief with Mr. Brown.

Before VAN OOSTERHOUT, Chief Judge, and BLACKMUN and HEANEY, Circuit Judges.

VAN OOSTERHOUT, Chief Judge.

Defendants Pipefitters Local Union No. 562, Lawrence L. Callanan, John L. Lawler and George Seaton were tried by a jury on indictment charging them with conspiracy under 18 U.S.C.A. § 371 to violate 18 U.S.C.A. § 610 which prohibits labor organizations from mak-ing contributions and expenditures to candidates for federal offices. Each defendant was found guilty by the jury. Under instructions given, the jury determined a willful violation of § 610 was not contemplated. The union was fined $5,000. The individual defendants, who were officers of Local 562, were each sentenced to one year imprisonment and fined $1,000. All defendants have taken a timely appeal from their conviction and sentence.

As grounds for reversal, all defendants urge prejudicial errors were committed by the trial court in the following respects:

I. Failure to sustain defendants' motions for acquittal made at the close of the government's case and renewed at the close of all of the evidence based upon the grounds: (1) That the evidence introduced in the case was insufficient to sustain a conviction. (2) There was a material and prejudicial variance between the allegations of the indictment and the proof offered.

II. Failure to hold that § 610 as construed and applied by the court violates rights guaranteed defendants by the First, Fifth,. Sixth and Seventeenth Amendments to the Constitution of the United States.

III. Failure to hold that the provision in the jury verdict that a willful violation of § 610 was not contemplated requires an acquittal of all defendants.

We affirm the convictions for the reasons hereinafter set out.

BACKGROUND.

Section 610 to the extent here pertinent reads:

"It is unlawful for any * * * labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select

candidates for any of the foregoing offices, * * * "

The origin, legislative history and purpose of § 610 is discussed in detail in United States v. C. I. O., 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849, and in United States v. International Union United Auto Aircraft and Agr. Implement Workers, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563. It is pointed out that Congress in 1907 enacted a statute making it unlawful for any corporation to make a money contribution in connection with an election for federal office in furtherance of the public interest for free elections. Such prohibition was later extended to labor organizations and this legislation in its present form is found in § 610. With respect to corporations, the Court in United States v. C. I. O. states:

"This legislation seems to have been motivated by two considerations. First, the necessity for destroying the influence over elections which corporations exercised through financial contribution. Second, the feeling that corporate officials had no moral right to use corporate funds for contribution to political parties without the consent of the stockholders." 335 U.S. 106, 113, 68 S.Ct. 1349, 1353.

With respect to extending the legislation to labor organizations, the Court in the same case observes:

"Its legislative history indicates congressional belief that labor unions should then be put under the same restraints as had been imposed upon corporations. It was felt that the influence which labor unions exercised over elections through monetary expenditures should be minimized, and that it was unfair to individual union members to permit the union leadership to make contributions from general union funds to a political party which the individual member might oppose." 335 U.S. 106, 115, 68 S.Ct. 1349, 1353.

Mr. Justice Rutledge, in reviewing the legislative history of the extension of the Corrupt Practices Act to labor organizations, indicates:

"[I]n one important respect the history again is clear, namely, that the sponsors and proponents had in mind three principal objectives.

"These were: (1) To reduce what had come to be regarded in the light of recent experience as the undue and disproportionate influence of labor unions upon federal elections; (2) to preserve the purity of such elections and of official conduct ensuing from the choices made in them against the use of aggregated wealth by union as well as corporate entities; and (3) to protect union members holding political views contrary to those supported by the union from use of funds contributed by them to promote acceptance of those opposing views. Shortly, these objects may be designated as the 'undue influence,' 'purity of elections,' and 'minority protection' objectives. These are obviously interrelated, but not identical. And the differences as well as their combination become important for deciding the scope of the section's coverage and its validity in specific application." 335 U.S. 106, 134–135, 68 S.Ct. 1349, 1363.

THE MOTIONS TO ACQUIT.

Defendants' timely motions to acquit were based on two grounds: (1) A material variance between the allegations of the indictment and the proof, and (2) the insufficiency of the evidence to support the convictions. Defendants urge that the indictment was insufficiently clear with respect to the source of the funds used in the conspiracy charge. Such contentions lack merit.

The indictment is lengthy and elaborate. Sixty-one overt acts are charged. The indictment charged that the defendants established the Pipefitters Voluntary Political, Educational, Legislative, Charity and Defense Fund, hereinafter called the fund, to have the appearance of being a wholly independent entity separate from Local 562 and thereby con-

ceal the fact that Local 562 would make contributions and expenditures in connection with certain elections. The indictment outlined defendants' complicated scheme to conceal the true nature of their activity and concluded by alleging that such activity amounted to an unlawful use of union funds contrary to § 610.

In United States v. Lewis Food Co., 9 Cir., 366 F.2d 710, 713, the court holds, "the allegation in the indictment that the corporation made an 'expenditure' for the stated purpose, necessarily infers an allegation that general corporate funds were used."

 The failure of the indictment to allege that the payments to the fund were involuntary is not fatal. The gist of the government's claim as reflected by the indictment is that the money in the fund is in truth and in fact money belonging to Local 562.[1] If such allegation is established by the evidence, the issue of whether the payment to the fund is voluntary or involuntary is not controlling.

Of course as observed by the court in its instructions, the issue of whether the payments to the fund were voluntary is relevant and material on the issue of whether the fund is the property of Local 562. Other considerations such as the intention of the donors as to ownership and control of the fund also bear upon the issue.

 We now pass to the issue of the sufficiency of the evidence to support the convictions. The evidence must be viewed in the light most favorable to the party prevailing in the jury trial, here the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86

1. While instructions given by the court to the jury are not relevant or controlling in determining the law to be applied in ruling upon motions for acquittal, it appears extremely likely that the court would apply the law as set forth in its instructions in passing upon the motions. Included in the instructions is the following:

"You will note that Section 610 prohibits contributions by labor organizations for use in connection with an election for a federal office. It does not prohibit any person from making or agreeing to make such contributions or setting up an independent fund for such purpose separate and distinct from union funds either alone or in conjunction with others, simply because such person happens to be a member of a labor organization. That is, the statute is not violated unless the [2,070] contribution is in fact and in the final analysis made by the labor organization.

"In this case evidence was offered by the Government to the effect that funds were contributed to or on behalf of candidates for federal office and that such funds were paid out upon checks drawn upon the Pipefitters Voluntary Political, Educational, Legislative, Charity and Defense Fund. It is necessary, therefore, that the evidence establish that the Pipefitters Voluntary Political, Educational, Legislative, Charity and Defense Fund was in fact a union fund, that the money therein was union money, and that the real contributor to the candidates was the union. As to this issue, the defendants contend that the fund in question was a bona fide entity separate and apart from the union, established by the voluntary good faith act of members of the Pipefitters Local 562 and others, from which contributions to candidates were made on behalf of the persons who created the fund and not on behalf of the union. On the other hand, the Government contends that the fund was a mere artifice or device set up by the defendants and others as a part of the alleged conspiracy to give the outward appearance of being an independent and separate entity but in fact constituting a part of union funds.

\* \* \* \* \*

"A great deal of evidence has been introduced on the question of whether the payments into the Pipefitters Voluntary Political, Educational, Legislative, Charity and Defense Fund by members of Local 562 and others working under its jurisdiction were voluntary or involuntary. This evidence is relevant for your consideration, along with all other facts and circumstances in evidence, in determining whether the fund is a union fund. However, the mere fact that the payments into the fund may have been made voluntarily by some or even all of the contributors thereto does not, of itself, mean that the money so paid into the fund was not union money."

L.Ed. 680. When the evidence is so viewed, we find ample evidentiary support for the jury verdict.

■ The essential elements of a § 610 offense are (1) contribution or expenditure, (2) by a labor organization, (3) for the purpose of active electioneering (4) in connection with an election for named federal offices described in the statute. It is virtually undisputed that elements (1), (3) and (4) are clearly established. The controversy relates to whether the contributions or expenditures were made by a labor organization. A labor organization is defined in § 610. Local 562 clearly fits the description of a labor organization. Thus if the numerous substantial contributions made to federal office candidates were made by Local 562, the contributions were made by a labor organization. On the other hand if the voluntary fund is a separate and distinct entity and it made the contributions, no violation of § 610 would exist as the voluntary fund as a separate entity would not constitute a labor organization.

Contributions alleged to be voluntary by members of Local 562 and members of other unions working within its jurisdiction aggregating $1,230,968 were made during the indictment period (1963–1968). The proceeds of such collections were maintained in a separate bank account of the fund. Disbursements out of the fund for aid of candidates for federal office during the indictment period aggregated $151,412. There is substantial evidence to support a jury finding that the fund was not a bona fide separate and distinct entity but was in fact a device set up to circumvent the provisions of § 610 and that the fund constituted union money. We will not attempt to set out the voluminous evidence, much of which is conflicting, in detail. Assessments had been made for the political fund since 1949. In 1962, the assessment for the fund for members of Local 562 and those working within its jurisdiction was 50¢ per man for each day worked. Local 562 abandoned collections through assessments in 1963.

In 1962, the union launched a campaign for check off of dues by employers of its members. Originally it was contemplated, as shown by the union minutes, that the check off be for 4% of the wages paid plus dues with 1½% included in the 4% going to the fund.

The local deliberately kept its membership relatively small so that advantageous employment would be available at all times for its members. It had jurisdiction over work covering a large part of the state of Missouri. Local 562 provided a considerable amount of work for members of other locals at more favorable rates of pay than prevailed in the jurisdiction of the locals. The attorney for the union advised the union that he was fearful that if Local 562 accepted dues and assessments from non-members it would be required to accept them into membership in Local 562. He also recommended that the contribution to the fund not be collected by check off and that voluntary pledge cards for the fund be obtained from those working on Local 562 projects and that the funds be raised through voluntary contributions. Thereafter Local 562 voted to reduce the assessment from 4% to 2½% of the wages and further that no assessments be made against non-members. Signatures of non-members and members working on Local 562 projects were obtained on voluntary contribution cards under which the signers who were members of Local 562 agreed to contribute $1.00 per 8 hour working day to the fund, with non-members agreeing to contribute $1.50 per 8 hour day. The extra 50¢ per day for non-members was equivalent to the cancellation of the 50¢ per day assessment which was abandoned. Subsequently the contribution of non-members was raised to $2.00 per working day.

When the assessment of members was raised in 1966 from $1.00 to $1.50 per day, contributions to the voluntary fund were reduced from $1.00 to 50¢ per day leaving the total combined assessment and contribution to the voluntary fund in the same total figure as previously existed.

The non-members of Local 562 working on its projects were not charged the customary $8.00 per month travel card assessment. However, their contribution to the fund substantially equalled the combined assessment and voluntary contribution made to the fund by members.

The contributions to the fund were generally collected regularly by the foreman on the job site in substantially the same manner in which assessments had previously been collected. Collection sheets were provided with columns containing the names of the employees, the number of hours worked and the amount paid to the fund. The purpose of keeping the records was so that the officers would know who contributed to the fund and how much. Reasons such as sickness or vacation were placed on the report sheet with respect to persons from whom no assessment was collected for the period covered. On some reports reference is made to back assessments.

A number of foremen testified that they did not know what would happen if the contribution was not paid because all of the members working under them regularly made payments to the fund.

There is evidence that a limited number did not make a contribution to the fund and that no reprisals were taken against them. Ordinarily such failure to pay was taken up with the union officials and instructions were received by the collectors not to press for payment. There is also testimony that the people working on the projects considered their employment advantageous and felt that they had no choice except to make the contribution. It would appear to be unrealistic to believe that such a large number of workmen would make such substantial voluntary contributions to be used for political purposes unless they felt that their job security required them so to do.

The union received national recognition because of its generous political contributions. The minutes of the local meeting of June 9, 1964, reflect that the union president had been introduced to President Johnson as "the representative of the most active political membership

The fund was freely used for making payments to serve many other union purposes. We are satisfied that all of the essential elements of conspiracy charged are supported by substantial evidence.

## CONSTITUTIONAL ISSUES.

Substantial and difficult problems are presented by the constitutional issues raised by the defendants. A minority of the Court in United States v. C. I. O., supra, and United States v. International Union, etc., supra, expressed the view that § 610 was unconstitutional. The majority by reason of its interpretation of the statute did not reach the constitutional issue. We shall treat separately the constitutional issues raised.

### A. FIRST AMENDMENT.

■ It is clear that the First Amendment protects the freedom of association, NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488, and that the activities of a labor union are within the scope of this protection. United Mine Workers of America, Dist. 12 v. Illinois State Bar Ass'n, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426. Since 18 U.S.C.A. § 610 regulates the activities of a labor union, it must be evaluated in light of First Amendment principles.

■ Finding that particular activities are within the purview of the First Amendment does not necessarily mean that they are free from governmental regulation. The rights of association are not absolute and may be regulated by the government in certain instances. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Garner v. Board of Public Works, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317.

■ In order to determine the validity of governmental regulation which touches constitutionally protected rights, the Court in Konigsberg v. State Bar of California, 366 U.S. 36, 51, 81 S.Ct. 997, 1007, 6 L.Ed.2d 105, indicated that "that perforce requires an appropriate weighing of the respective interests involved." Therefore, a court must balance the interest of the government in the regula-

and the organization in their freedom of association. Since the value of the freedom of association is considered extremely high in our society, if a governmental regulation of association is to prevail against constitutional attack, the government must demonstrate a "compelling" interest in the regulation in question. See Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192; Cf. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965. Therefore, in order to determine the validity of 18 U.S.C.A. § 610, the court must find a compelling governmental interest which overrides the interest of the association in the activities prohibited. There is such a compelling interest.

Since it is possible for a person to be required to join a union as a condition of employment, one of the purposes for the passage of 18 U.S.C.A. § 610 was to "protect union members holding political views contrary to those supported by the union from use of funds contributed by them to promote acceptance of those opposing views." Mr. Justice Douglas concurring in International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141, thought this to be an extremely troublesome problem. He said:

> "[M]embership in a group cannot be conditioned on the individual's acceptance of the group's philosophy. Otherwise, First Amendement rights are required to be exchanged for the group's attitude, philosophy or politics. I do not see how this is permissible under the Constitution." 367 U.S. 740, 777, 81 S.Ct. 1784, 1804.

Congress in passing 18 U.S.C.A. § 610 was attempting to protect the individual union member's right to his own political views and the right to support or not to support them through money contributions. In light of the substantial interest each individual has in his own political activities, it follows that Congress in passing the legislation was responding to a compelling interest.

Even when it is found that the government has acted to protect a compelling interest, the First Amendment requires further analysis. To this point the Court in Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, said:

> "In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be narrowly achieved. The breadth of legislative abridgement must be viewed in light of less drastic means for achieving the same basic purpose."

The issue under this analysis is whether 18 U.S.C.A. § 610 narrowly achieves the legitimate Congressional purpose without needlessly treading on constitutional rights.

 When § 610 is given the interpretation previously discussed in this opinion, it does not go beyond protecting the valid governmental interest and infringe unnecessarily on constitutional rights. Separate voluntary political associations by union members are not in any way proscribed by the statute. Therefore, § 610 is not unconstitutional under the First Amendment.

### B. VAGUENESS.

It is of course necessary to evaluate § 610 in relation to the concept of constitutional vagueness. This principle was set out in United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989, where the Court said:

> "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."

 The Court in Cramp v. Board of Public Instruction, 368 U.S. 278, 287, 82 S.Ct. 275, 281, 7 L.Ed.2d 285, added:

> "The vice of unconstitutional vagueness is further aggravated where, * * * the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution.

The vagueness problem therefore is whether a person could know from reading § 610 what is proscribed by its terms.

 One matter which was previously pointed out was that substance rather than form governs the question of whether a particular contribution or expenditure came from a "labor organization." Such approach requires a court or jury to evaluate the totality of the circumstances and determine who in fact made the contribution or expenditure—a separate and distinct organization or a § 610 labor organization. The legality of the conduct of a labor organization making contributions and expenditures is not difficult to determine. A labor organization can predict what its officials and employees may do by evaluating the organization's duty under § 610 and not allow its officials and employees to engage in conduct which is inconsistent with this duty.

### C. DUE PROCESS—EQUAL PROTECTION.

 The due process clause of the Fifth Amendment includes within it a concept of equal protection. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884. Therefore, the federal government, as well as the states, is not allowed to pass legislation which makes arbitrary classifications. The appellants argue that § 610 makes an arbitrary classification because it prevents members of the working class from political action whereas members of richer classes are not so prohibited, even though banks and corporations are also prohibited from making political contributions and expenditures. The argument is that the corporate executives personally make political contributions which have an impact on the political process, and § 610 prohibits members of the working class from aggregating their funds to have a similar impact. The problem with this argument is that § 610 does not prohibit working men from such activity. Section 610 only prohibits them from being forced into it. Therefore, § 610 does not create a classification which is subject to an equal protection claim.

### D. RIGHT TO VOTE FOR SENATORS AND REPRESENTATIVES.

 It has been argued that § 610 abridges the right to vote for Congressmen and Senators. This argument is based on the assumption that § 610 prohibits any labor group from associating and engaging in political activities. As previously pointed out this is not the proper construction of § 610. When § 610 is given the interpretation as described in this opinion, this argument totally lacks merit.

### EFFECT OF JURY FINDING THAT A WILLFUL VIOLATION OF § 610 WAS NOT CONTEMPLATED.

The signed jury verdict Form B returned by the jury found each defendant guilty as charged in the indictment and then went on to say, "We further find that a willful violation of Section 610 of Title 18, United States Code, was not contemplated."

 Defendants urge that the quoted sentence requires an acquittal on the conspiracy charge. We do not agree.

Verdict Form B together with Form A finding the defendants guilty without containing the sentence hereinabove quoted were submitted to the court under an instruction that "Form B may be used by you only in the event you find one or more of the defendants guilty of the willful conspiracy charged and further find that the conspiracy of which said defendant is found guilty did not contemplate a willful violation of § 610."

Section 610 carries a penalty of a fine not to exceed $5000 for a corporation or labor organization and not to exceed $1000 or one-year imprisonment for individual defendants. The statute further provides that if the violation was willful the penalty is a fine up to $10,000 and imprisonment up to two years. Eighteen U.S.C.A. § 371 under which defendants were tried and convicted contains a provision that if the offense, the commission of which is the object of the conspiracy is a misdemeanor only, the punishment shall not exceed the maximum imposed for the misdemeanor. Eighteen U.S.C.A. § 1 defines a misdemeanor as an offense

carrying a penalty of one year or less imprisonment. Thus it would appear that the clear purpose of the instruction and verdict Form B was to advise the court whether defendants were guilty of conspiracy to commit a misdemeanor or a felony for the purpose of guiding the court in assessing a permissible penalty.

The court in its instructions properly set forth the elements of the conspiracy including the necessity of proving that each defendant knowingly and willfully participated in the conspiracy to violate § 610. Included in the instructions is the following:

> "The crime charged in this case requires proof of specific intent before a defendant can be convicted. Specific intent, as the terms implies, means more than the general intent to commit the act. To establish specific intent the Government must prove that the defendant knowingly, willfully and purposely did an act which the law forbids. Such intent may be determined from all the facts and circumstances shown by the evidence.
>
> \* \* \* \* \* \*
>
> "An act is done 'willfully' if done voluntarily and purposely and with the specific intent to do that which the law forbids; that is to say, with bad purpose either to disobey or to disregard the law."

The necessity of proving willfulness as an element of the conspiracy is repeated in various places in the instructions.

When the verdict is read in the light of the applicable law and the court's instructions, we are satisfied that the jury by its verdict intended to and in fact did convict the defendants of the conspiracy charged.

It is also of some significance that the defendants took no exception to verdict Form B or the instructions relating to its submission. Defendants were in no way prejudiced by the submission of Form B. The jury finding in the last sentence of the form in reality amounted only to a finding that the conspiracy related to a misdemeanor rather than a felony and defendants were thus benefited by such finding by being exposed only to the lesser sentence provided in § 371 for conspiracy, the object of which is a misdemeanor.

Defendants have made no attack on this appeal upon any instructions given by the trial court or to the evidentiary rulings. We conclude that the defendants have had a fair trial and that they have failed to establish that the court has committed any prejudicial error.

The judgments appealed from are affirmed.

HEANEY, Circuit Judge, dissents and reserves the right to file a dissenting opinion setting out his views.

HEANEY, Circuit Judge (dissenting).

While I share the view of the majority that the indictment was not fatally defective, I would reverse and remand to the trial court with instructions to it to grant the defendants a new trial. See, United States v. Lewis Food Company, 366 F.2d 710 (9th Cir. 1966).[1] At this new trial, the principal question would be whether, in the light of all the evidence, the contributions to the federal candidates were made from funds which could fairly be said to have been voluntarily contributed by members and non-members with knowledge of the fact that all or part of their contribution would be used for political purposes. See,

---

1. "All that is required of an indictment is that it be a plain, concise and definite written statement of essential facts constituting the offense charged. Rule 7(c), Federal Rules of Criminal Procedure; Rood v. United States, 8 Cir., 340 F.2d 506, 510. With respect to the use of general corporate funds this indictment meets these requirements. Entry of the plea of not guilty, therefore, gave rise to a question of fact as to the source of the corporate funds. When the Supreme Court, in the *Auto Workers* case, asked (352 U.S. at 592, 77 S.Ct. at 542): '[W]as the broadcast paid for out of the general dues of the union membership or may the funds be fairly said to have been obtained on a voluntary basis?' The Court was referring to questions of fact which must be resolved at the trial level and was not referring to any inadequacies in the indictment."
United States v. Lewis Food Company, 366 F.2d 710, 713 (9th Cir. 1966).

United States v. International Union United Auto Aircraft and Agricultural Implement Workers, 352 U.S. 567, 592, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); 93 Cong.Rec. 6437–6440 (1947).

There is evidence in this record indicating that the contributions to the Pipefitters' fund were, in the above sense, knowingly and voluntarily made. There is also substantial evidence to the contrary. But the jury was specifically instructed that it could find the defendants guilty even if it believed all of the contributions were voluntarily made.[2] Such an instruction was, in my view, erroneous.

The government acknowledges in its brief that a union acting through its officers, agents and members may form a political organization parallel to the union and use union personnel to solicit and spend direct voluntary contributions for federal elections. It concedes that COPE and countless other political action groups have been so organized and operated. The difficulty with this acknowl-

edgement is that it comes too late. The trial court, although requested to, refused to give an instruction embodying this concept. Indeed, the thrust of its direction was that the very participation of union officers and agents in the organization and operation of the political fund was evidence of impropriety. Compare, International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).

The government contends in its brief that the contributions to the fund were in fact assessments, were in fact part of the general dues' structure and were in fact involuntarily made. These may indeed be the facts and if the jury had made such a finding, a violation of Section 610 would have been made out. But again, this the jury was not requested to so find. It was instructed to answer the broader question of whether the contributed funds constituted a part of the Union funds. Nineteen facts and circumstances were listed as bearing on the answer to this question.[3] Some of the

2. "A great deal of evidence has been introduced on the question of whether the payments into the Pipefitters Voluntary Political Educational, Legislative, Charity and Defense Fund by members of Local 562 and others working under its jurisdiction were voluntary or involuntary. This evidence is relevant for your consideration, along with all other facts and circumstances in evidence, in determining whether the fund is a union fund. However, the mere fact that the payments into the fund may have been made voluntarily by some or even all of the contributors thereto does not, of itself, mean that the money so paid into the fund was not union money."

3. "1. Whether or not payments to the fund were routinely made at regular intervals at job sites,
"2. Whether or not payments to the fund were routinely collected by union stewards, foremen, area foremen, general foremen, or other agents of the union,
"3. Whether or not the payment to the fund was determined by a formula based upon the amount of hours or overtime hours worked upon a job under the supervision of the union,
"4. Whether or not payments to the fund were at one rate for 562 members and at a different rate for members of other unions,

"5. Whether or not payments to the fund began, continued and terminated with employment on a job under the jurisdiction of the union,
"6. Whether or not monies of the fund were used to provide benefits to union members in their capacity as members,
"7. Whether or not payments to the fund by members of other unions were in lieu of payments to the union in the form of travel card dues in the amount of eight dollars per month,
"8. Whether or not monies of the fund were used in part to promote activities properly permitted to the union pursuant to Section 2.05 of its Constitution and by-laws,
"9. Whether or not payments to the fund were made by those affiliated with the union to the general exclusion of other classes of persons or organizations,
"10. Whether or not contributions to the fund were required as a condition of employment or continued employment of membership in Local 562,
"11. Whether or not the individuals who contributed to said fund signed a voluntary contribution agreement,
"12. Whether or not the contributions to said fund were made voluntarily or involuntarily,

facts and circumstances were relevant to the issue of knowledge and voluntariness and others, irrelevant. One example of the latter was the instruction that the jury could consider whether the payments to the fund were routinely collected by the Union Stewards and agents of the Union at the job site.

The government further contends that the political funds were spent by the individual defendants arbitrarily and without consultation with the contributors. There is some evidence in the record to support this contention. Although such a practice is of questionable legality and is undesirable and undemocratic, it constitutes no violation of Section 610.

The argument is also made by the government that at least one official of the fund diverted a portion of the funds collected for political purposes to his personal use. While this act may also have been illegal and reprehensible, it was not a violation of the statute.

Finally, the government contends on appeal that the fund was used to provide benefits to some of the members of the Union. There is again evidence in the record to support this contention, but the fact of the matter is that the fund was established for educational, legislative, charitable and defense as well as political purposes. And as I read Section 610, there is nothing in it which prohibits a union, its officers and agents from soliciting voluntary contributions for political and other purposes so long as those contributing know that all or part of the funds will be used in support of political candidates.

Nothing I have said in this opinion should be taken to indicate that a union or its officers and agents can evade the

"13. Whether or not the monies contributed to said fund were kept separate and distinct from the funds of Local 562,

"14. Whether or not some persons who worked under the jurisdiction of Local 562 did not contribute to said fund,

"15. Whether or not the monies of said fund were used in part to promote activities which were prohibited to Local 562 by its Constitution and By-Laws,

"16. Whether or not said fund was established and maintained pursuant to the advice of counsel,

prohibitions of Section 610 by obtaining contribution cards from contributors indicating that the contributions were voluntarily made for political purposes. The test is whether the contributions are in fact so made.

Because I would remand for a new trial, I find it unnecessary to pass on the First Amendment validity of Section 610. This issue can be reached if the defendants are convicted under proper instructions.

I likewise express no view on the question of whether the jury's finding that a willful violation of Section 610 was not contemplated by the defendants required a reversal on the conspiracy charge. I am confident that on retrial, the verdict forms would eliminate this ambiguity.

"17. Whether or not the monies of said fund were reported to the Department of Labor on the LM-2 forms, which required the reporting monies of Local 562,

"18. Whether or not expenditures from the fund were under the control of the union and its officers,

"19. Whether or not records used in the collection of the payments to the fund are similar to those employed from time to time by the union in the collection of its regular dues and assessments."