Jesse J. LEWIS and the National Democratic Party of Alabama, an Association incorporated and operating under the laws of the State of Alabama, Plaintiffs, Sigma Delta Chi, Professional Journalistic

Society, Alabama Professional Chapter, Plaintiff-Intervenor,

v.

William BAXLEY, as Attorney General of Alabama, Defendant.

Civ. A. No. 4182-N.

United States District Court, M. D. Alabama, N. D.

Dec. 21, 1973.

Morris S. Dees, Jr., Joseph J. Levin, Jr., Charles F. Abernathy, of Montgomery, Ala., and Orzell Billingsley Jr., Birmingham, Ala., for plaintiffs and plaintiff-intervenor.

William J. Baxley, Atty. Gen., George Beck, Deputy Atty. Gen., and George W. Royer, Jr., Asst. Atty. Gen., Montgomery, Ala., for defendant.

Before RIVES, Circuit Judge, and JOHNSON and VARNER, District Judges.

JOHNSON, District Judge:

 Plaintiffs,[1] suing on their own behalf and as representatives of a class composed of newsmen reporting on state governmental activities in Alabama, seek to have one section of the new Alabama ethics statute[2] declared unconstitutional on its face and to have its enforcement enjoined. Plaintiffs invoke the jurisdiction of this Court pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343, 2201, and 2284. Defendant William Baxley is Attorney General of the State of Alabama and is sued in his capacity as such[3] and as representative of a class of defendants composed of those empowered to take action against plaintiffs under the provisions of the ethics statute.[4]

It appearing that the constitutionality of a statute of statewide application was in question, a three-judge court was constituted pursuant to the requirements of 28 U.S.C. § 2281.

The case is submitted upon the pleadings, briefs, affidavits, stipulations, testimony and argument at the hearing on the motion for temporary restraining order on September 18, 1973, and argument of counsel for all parties.

## I. Facts

On September 14, 1973, the Governor of Alabama signed into law a new statute governing the ethics of public officers in this state. In the course of the legislative debate over that bill, the following amendment, having been proposed from the floor, was passed and became law upon the signing of the Act:

> Section 14. Members of the press who cover the State Legislature or state government in any way, either as a member of an editorial staff or through direct reporting, prior to being admitted to galleries, press rooms, committee meetings, any space set aside for use of the press, the floor of the legislature, or press conferences by a member of the legislature or a government official, shall file a statement of economic interest in accordance with the provisions of this Act at the office of the State ethics commission and shall have been approved by the State ethics commission for a special press pass and shall be subject to the provisions of the Act. The statement of economic interest filed by members of the press shall

---

1. Plaintiff Jesse J. Lewis is owner and publisher of a publication entitled the *Birmingham Times*. Plaintiff or his agents from time to time come to Montgomery to report on the proceedings of state government. Plaintiff National Democratic Party ["NDPA"] publishes a newspaper entitled the *Eagle Eye*. Reporters and editors of the *Eagle Eye* from time to time attend proceedings of state government and report on them in their paper. Sigma Delta Chi, a professional journalism society, has also intervened as plaintiff.

 We do not understand defendants to contest seriously the standing of plaintiffs, or the validity of the class. Nevertheless, this Court explicitly holds that all plaintiffs have standing and that the class action portion of this suit is properly maintainable [see note 4, *infra*].

2. Apparently the only title so far carried by that legislative enactment is "Substitute Senate Bill 1, 1973 Session of the Alabama Legislature." The Governor of the State of Alabama signed that bill into law on September 14, 1973. Plaintiffs challenge Section 14 of this enactment.

3. Defendant might be deemed to have raised a defense premised upon the Eleventh Amendment, subsumed under his affirmative defenses asserting lack of subject matter jurisdiction and principles of comity. Under state law in Alabama, officials of the state may be sued in their official capacity for equitable relief notwithstanding the sovereign immunity of the state itself. Southall v. Stricos Corp., 275 Ala. 156, 158, 153 So.2d 234 (1963). Since such a suit for equitable relief is not deemed one against the state, the strictures of the Eleventh Amendment are inapplicable. Aerojet-General Corp. v. Askew, 453 F.2d 819, 828–29 (5th Cir. 1971), cert. denied, 409 U.S. 892, 93 S.Ct. 110, 34 L.Ed.2d 149 (1972).

4. The class of defendants is at least principally composed of all district attorneys of the State of Alabama. Other members of the class of parties defendant are those who are authorized to refuse to grant plaintiffs access to public places or public records, under the provisions of this statute.

further include the names of all newspapers or publications, radio stations, or news-gathering organizations by which they are employed, and what other occupations or employment they may have, if any; and they shall further declare that they are not employed in any legislative or executive department of government, and that they are not employed, directly or indirectly, by any person or corporation having legislation before the State Legislature, and that they will not become so engaged in any of these activities while covering the State Legislature or state government.

Section 14 was introduced by Representative McCorquodale and was passed by an affirmative vote of 42–7. It appears that under the rules of procedure of the Alabama Legislature no public committee hearings are held on floor amendments, and none were held on this amendment. The only legislative history which has been offered in this case is a transcription of a filmed news report on a colloquy on the legislative floor by the sponsor of this provision and another representative:

> Rep. McCorquodale: "And all this does, it says that all the press that covers the Legislature, all the news media that covers the Legislature, must reveal because they do contribute to influencing toward legislation by editorials, by newsstories, and by television editorials and other manner and it would provide that they should reveal financial interests other than where they are employed or if they represent any other company."

> Rep. Phil Smith: "Now, isn't that person—aren't there some pretty stringent requirements in the substitute [the bill prior to its amendment in this respect] about lobbyists and aren't those people going to be included if they are in fact lobbying?"

> Rep. McCorquodale: "No sir, let me answer this I think as direct as I

know how. There are a number of people connected with the press today both in newspaper and television and other areas that as we normally term they moonlight and as they moonlight we should be, it should be some disclosure and this is not against the press but this should be disclosed to the public just as well as a public official." [5]

Plaintiffs have introduced evidence showing, and this Court finds, that reporters will be substantially hindered by Section 14 in their efforts to report on the activities of state government in Alabama. Refusal of access to the areas normally reserved for the press covering state government will limit the availability of some segments of the press to legitimate and public items of news. While under the Act access will apparently be granted upon disclosure, this Court finds that a requirement of economic disclosure by members of the press will tend to have the effect of driving some members out of the press altogether or to cause members of the press to limit their associational ties in order to avoid disclosure. This Court finds that such results will flow from the statute; that these results are unconstitutional does not *necessarily* follow, but that possible result will be analyzed in the light of the applicable law.

## II. *Preliminary Defenses*

Defendants plead several matters which should be considered prior to our reaching the merits. There appears to be some confusion in the briefs between the *Younger* doctrine [Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)] and the abstention doctrine. These defenses will be discussed separately for the sake of clarity.

A. *Younger Doctrine.* Defendant asserts that because of the *Younger* doctrine, this Court should decline to exercise its jurisdiction in this case. The *Younger* doctrine provides that, absent

5. Plaintiffs and defendants have stipulated that this transcript is a true and correct copy of the exchange of remarks which it purports to represent.

certain extraordinary circumstances, federal courts should not intervene in ongoing criminal prosecutions.

■ This case is no sense concerns the criminal laws of the State of Alabama. This regulatory statute governs disclosure and prohibitions of access to news; it is the disclosure and access provisions which are at issue, not the possible criminal sanction which would accrue to one who disobeyed the statute. It is apparent that the purpose of this section was to regulate newsmen who cover state government; the state has not asserted an interest here in prosecuting criminal conduct under state criminal statutes. "We see nothing in this sort of regulatory activity which might be construed as an integral part of [Alabama's] enforcement of its criminal laws." Polk v. State Bar of Texas, 480 F.2d 998 (5th Cir. 1973). In this case, it is unnecessary to require citation of an exception to the *Younger* doctrine; that doctrine is simply inapplicable. We are not dealing with Alabama's criminal justice system.

■ B. *Abstention.* Defendants also assert that this Court should abstain from deciding this issue, under the doctrine of abstention [as opposed to the *Younger* doctrine]. The doctrine of abstention is a judge-made doctrine first espoused in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The doctrine of abstention has a limited applicability, however. Congress has seen fit to endow the federal judiciary with the power to render declaratory judgments. While there may be certain circumstances in which a suitor could bring his claim in either a state court or a federal court, the existence of a state court remedy does not oust the federal court of its jurisdiction under the Declaratory Judgment Act. As the Supreme Court has noted,

> Congress [has] imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and

decision of his federal constitutional claims. Plainly, escape from that duty is not permissible merely because the state courts also have the solemn responsibility, equally with the federal courts, "to guard, enforce, and protect every right granted or secured by the constitution of the United States . . . ." The judge-made doctrine of abstention . . . sanctions such escape only in narrowly limited "special circumstances" . . . These principles have particular significance when, as in this case, the attack upon the statute on its face is for repugnancy to the First Amendment. In such a case to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect.

Zwickler v. Koota, 389 U.S. 241, 248, 252, 88 S.Ct. 391, 398, 19 L.Ed.2d 444 (1967). *Accord,* Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 510, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972).

■ It is clear that the federal court may be warranted in abstaining if the challenged state statute could be construed in such a way as to avoid or substantially modify the federal constitutional question. Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 510, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); Wulp v. Corcoran, 454 F.2d 826, 833 (1st Cir. 1972); Lewis v. Kugler, 446 F.2d 1343, 1346 (3d Cir. 1971).

■ There is a state constitutional provision which could in some small measure possibly alter the scope of the issue presented here. By forcing plaintiffs to litigate through the state courts, it is possible that a state construction of Ala.Const. Article IV, § 57 (1901) would guarantee to the press floor privileges in the legislature. However, there still would remain several substantial federal constitutional issues: the provisions limiting access to the galleries, halls, offices, and press conferences relative to

state government, and the provisions requiring disclosure by newsmen. Such a state construction would not appreciably reduce the magnitude of the First Amendment question at issue in this case. Abstention is therefore inappropriate in this case.

### III. *First Amendment Right of Access to the News*

 Journalists and newsmen have a First Amendment right to reasonable access to certain items of news. That right is of necessity a limited one. The press has no constitutional right of access to private financial or personal information. Newsmen have no constitutional right to tap telephones, to intercept mail, or to peer into windows of famous or humble people. Their First Amendment rights are not violated if they are reasonably excluded

> from grand jury proceedings, [Supreme Court] conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal.

Branzburg v. Hayes, 408 U.S. 665, 684–685, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972).

 Nevertheless, inherent in the First Amendment right of freedom of the press is a limited right of reasonable access to certain kinds of news. It is apparent that the First Amendment right to publish must logically include to *some* degree a right to gather news fit for publication. Freedom to publish news, without some protected ability to gather it, would render freedom of the press an unduly gossamer right.

Without yet defining some circumstances under which the limited right may reasonably be restricted, it may be

seen that this limited First Amendment Right of access at least extends to information or events to which the general public is not denied access. One district court has noted the existence of the right of access in a case in which newsmen had been prohibited from copying public records which were accessible to the general public. That court noted that

> where such records as these are public records and where there is no reasonable basis for restricting their examination and publication, the attempt here to prohibit their publication is an abridgement of the freedom of speech and of the press. [The City Council] seek[s] to place in [its] discretion . . . the granting or denial of a constitutional right.

Providence Journal Co. v. McCoy, 94 F. Supp. 186, 195–196 (D.R.I.1950), aff'd on other grounds, 190 F.2d 760 (1st Cir. 1951). Similarly, the United States Court of Appeals for the Seventh Circuit has held that a complaint states a claim on which relief may be founded if it alleges that the "police were interfering with plaintiffs' constitutional right *to gather* and report news." Schnell v. City of Chicago, 407 F.2d 1084 (7th Cir. 1969) (emphasis added).

Several years ago, the United States Court of Appeals for the Ninth Circuit, in dictum, identified the right to gather news as a First Amendment right:

> When the Constitution speaks of the freedom of the press, it refers to the freedom [of journalists] . . . *engaged in news gathering* and dissemination, from interference by governmental agencies.

Associated Press v. KVOS, 80 F.2d 575, 581 (9th Cir. 1935), rev'd on other grounds, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936) (emphasis added).

 Several other lower courts have recognized, at least by negative implication, that a limited right to access to some news exists. Two courts, while pointing out that journalists had no right of access to non-public informa-

tion, seemed to imply that journalists *did* have a right of access to news accessible to the public. One district court held that

> the conclusion is inevitable that the Constitutional privilege of freedom of the press does not include a right on the part of representatives of the press to inspect documents *not open to members of the public generally.*

Trimble v. Johnston, 173 F.Supp. 651, 655–656 (D.D.C.1959) (emphasis added). Or, as another court put it more generally, "a journalist's professional status does not entitle him to sources of news *inaccessible to others.*" Garland v. Torre, 259 F.2d 545, 548, n. 4 (2d Cir.), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958) (emphasis added). The clear implication of these cases is that a journalist *is* entitled to access to information available to the general public.

The United States Supreme Court has never explicitly decided whether or not there is a constitutional right of access to news. However, the Supreme Court has used carefully limited language, indicating that the press may well have a right of access to information available to the public generally. In Branzburg v. Hayes, the Court wrote that

> It has generally been held that the First Amendment does not guarantee the press a constitutional right of *special access to information not available to the public generally.*

408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972) (emphasis added). Similarly, the Court has noted that the "right to speak and publish does not carry with it the *unrestrained* right to gather information." Zemel v. Rusk, 381 U.S. 1, 16–17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965) (emphasis added). Thus, it appears clear that the Supreme Court has carefully left room for the development of a limited right to reasonable access to the news.

A district judge in the United States District Court for the District of Columbia has very recently decided a case which is quite similar in its factual setting to this case. Consumers Union v. Periodical Correspondents' Ass'n, 365 F.Supp. 18 (D.D.C.1973). That court dealt with the issue of access to Congressional press galleries. Congress had granted power to defendant association to issue or deny credentials (granting access to press galleries) to members of the press. Final authority to grant or withhold such privileges was lodged in the Speaker of the House and in the Senate Committee on Rules and Administration. Accreditation carried with it a right to use the galleries and to attend press conferences; in sum, roughly the same rights involved in this case. The publisher of a consumer magazine sought admission of one of its reporters to the association. Admission was denied pursuant to a rule denying membership to media not "owned and operated independently of any industry, business, association, or institution." Judge Gesell of the United States District Court for the District of Columbia explicitly recognized that a First Amendment right of access to the news had been denied:

> A free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint. This is a dangerous and self-defeating doctrine . . . While it is perfectly true that reporters do not have an unrestricted right to go where they please in search of news, . . . the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation. Access to news, if unreasonably denied . . ., constitutes a direct limitation upon the content of news . . . Certainly the exclusion of particular reporters from the news presented each morning at on-the-record press conferences, which hundreds of other reporters are eligible to attend, affects the content and quality of the news that is reported as

well as access to the sources of news. Moreover, it is important to recognize that this is not a single, sporadic refusal of access. Exclusion from the press galleries constitutes a permanent disadvantage with regard to the gathering of news and has a significant impact when measured in terms of the First Amendment . . . .

Consumers Union v. Periodical Correspondents' Ass'n, 365 F.Supp. 18, 25 (D.D.C.1973). It should be noted that exclusion in this case presents a much more serious threat to the First Amendment than does exclusion from Congressional press galleries in the *Consumers Union* case. There, even those excluded from the press galleries were allowed to sit in the public galleries. Here, the exclusion is complete. Furthermore, proceedings of the Congress are reported verbatim in the *Congressional Record,* where they may be read by any and all who are interested. There is no such record of proceedings in the Alabama Legislature. Without press coverage, the events which transpire in the Alabama Legislature would soon be virtually hidden from the public, since only those with the leisure to attend daily sessions (or lobbyists who are paid to do so) could follow the proceedings of their state government. It is significant in the case now before us that the only preserved legislative history of this statutory provision was presented to this Court in the form of a transcript of a filmed news report. Loss of such press coverage would be loss of an inestimable First Amendment right in this case.

■ Therefore, we hold that members of the press have a limited First Amendment right of reasonable access to news of state government. In the context of this case, that means that newsmen have a right to go where the public generally may go in observance of its government. That right extends also to access to places where other members of the press may go and congregate in the ordinary course of events. In other words, there is a limited First Amendment right of access to the public galleries, the press rooms, and the press conferences dealing with state government. The right is limited, however, to these circumstances. We do not mean or intend to hold that if one reporter is granted an individual interview, all other reporters have a constitutional right to such an interview. We emphasize, the right of access is a limited right to reasonable access.

Although this case involves only the United States Constitution, it should be noted that a right of access does not contravene any longstanding policy of the State of Alabama. Five successive Alabama constitutions provided that ordinary legislative sessions were to be conducted openly.[6] The present Alabama Constitution appears to go so far as to grant privileges of the legislative floor to the press along with a select few governmental leaders. The Alabama Constitution of 1901 (the present constitution) provides that

> The doors of each house shall be opened, except on such occasions as, in the opinion of the house, may require secrecy; but no person shall be admitted to the floor of either house while the same is in session, except members of the legislature, the officers and employees of the two houses, the governor and his secretary, *representatives of the press* and other persons to whom either house, by unanimous vote, may extend the privileges of its floor.

Ala.Const. Art. IV § 57 (1901) (emphasis added). Thus, there can in no way be said to be a single-minded state policy mandating exclusion of certain members of the press from the halls of government.

■ Judge Varner in his dissent states that he would allow the press to

---

6. "The doors of each House shall be open, except on such occasions as, in the opinion of the House, may require secrecy." Ala. Const. Art. IV, § 15 (1875); Ala.Const. Art.

IV, § 13 (1868); Ala.Const. Art. IV, § 16 (1865); Ala.Const. Art. II, § 21 (1861); Ala.Const. Art. II, § 21 (1819).

have free access to the public galleries, but would condition entry to the press rooms upon disclosure as required by the statute. Such a restriction upon entry to the press rooms would, in our opinion, severely and unconstitutionally restrict access of newsmen (and through them, the public) to the news of state government. Indeed, such an interpretation seems to contravene the policy of the Alabama Constitution which, as discussed above, appears to accord to members of the press privileges of the floor in the state legislature. The dissenting judge also takes the position that we should save the state statute by according to it a narrowed and constitutional construction. Such a course of action by a Federal Court is improper. The law is clear that a Federal Court is powerless to construe state statutes narrowly. That is a function of state courts, and this Court may not engage in that process. Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1973).

■■■ Despite the fact that there exists a limited First Amendment right of access to the news, that right may in certain circumstances be balanced against, and even outweighed by, other legitimate state interests. This necessitates our examination of the test used to balance the right of access against other valid interests of the state.

## IV. *Balancing Test*

■■■ In the balancing process where First Amendment rights are involved, courts balance the importance of the activity and the degree and type of restraint against the governmental interest in having the particular restraining law that infringes or tends to infringe upon First Amendment rights.

■■■ This balancing test is two-pronged: first, whether the asserted state interest is "compelling" (or "paramount"), and second, whether the state's action has the requisite nexus with the state's asserted goal.

The first part of the test is clear: the state must be acting pursuant to a governmental interest which is "compelling" or "paramount." Branzburg v. Hayes, 408 U.S. 665, 700, 92 S.Ct. 2646, 33 L. Ed.2d 626 (1972); DeGregory v. Attorney General, 383 U.S. 825, 829, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966); Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 546, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); Talley v. California, 362 U.S. 60, 66, 80 S.Ct. 536, 4 L. Ed.2d 559 (1960) (Harlan, J., concurring); Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama, 357 U.S. 449, 463, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

The second part of the test, the requisite nexus between the action by the state and the "evil" to be abated, is less clear. Most cases require that the action by the state must bear a "substantial" relationship to the goal asserted by the state. Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 546, 83 S.Ct 889, 9 L.Ed.2d 929 (1963); NAACP v. Alabama, 357 U.S. 449, 464, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Cf. Talley v. California, 362 U.S. 60, 66, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (Harlan, J., concurring); Bazaar v. Fortune, 476 F.2d 570 (5th Cir. 1973) ("necessarily related"); Shanley v. Northeast Independent School District, 462 F.2d 960 (5th Cir. 1972) ("material and substantial"). However, there is at least one case which holds that the state need show only a "reasonable" relationship between the evil sought to be regulated and the action taken. Bates v. Little Rock, 361 U.S. 516, 524–525, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). That issue was recently regarded by the Supreme Court as an open one. Branzburg v. Hayes, 408 U.S. 665, 700–701, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

■■■ This Court holds that, depending upon the circumstances, both tests may have their place in balancing the limited First Amendment right of

access against paramount state interests. When the state seeks to bar journalists from areas from which the public in general is not excluded, the state must show a "substantial" nexus between the action and its asserted governmental interest. Similarly, the state must show a "substantial" nexus when it seeks to exclude one or more members of the press from areas or occasions to which other members of the press are admitted, such as press rooms or press conferences. A substantial nexus is also required when a state seeks economic disclosure from newsmen. A necessary part of this showing of a substantial nexus must be a showing of the unavailability of a less restrictive means toward the asserted governmental end.

 On the other hand, the state may in some circumstances bar access by members of the press to governmental activities upon a showing of a mere "reasonable" nexus with the asserted end. This "reasonableness" standard would be brought to bear when the public is generally excluded from access to the activity in question. For example, the government may reasonably bar the press, alike with the public, from attendance at grand jury sessions, conferences of appellate judges, conferences of trial judges in chambers, non-public sessions of legislative bodies, dangerous areas (fire, riot, flood), and perhaps other occasions and events.

 In this case, the state is asserting the right to exclude certain members of the press from public sessions of the legislature, and from press conferences and press rooms from which other members of the press are not excluded. In this instance, the state must assert a compelling governmental interest and a substantial nexus between that interest and the action taken in furtherance thereof.

The State of Alabama, in the brief of defendant Baxley, asserts two interests, both of which it alleges are reasonably furthered by Section 14 of the ethics statute. "[T]hese purposes are protection of the public from interested and improperly influenced news coverage and protection of the legislature from surreptitious lobbying newsmen."

 This Court is of the opinion that "protection of the public from interested and improperly influenced news coverage" is not a compelling governmental interest. That interest, therefore, fails to meet the first criterion of the two-step test. Not only is that asserted interest less than paramount, it may in fact be an interest with which the government may not constitutionally concern itself at all. The very essence of a free press is that there is room in our country for publication by every segment of "interested" opinion, and that out of the free comparison of the opinions of different "interested" sides, citizens can make their own determination as to truth. As Judge Gesell noted, a

> free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint. This is a dangerous and self-defeating doctrine.

Consumers Union v. Periodical Correspondents' Ass'n, 365 F.Supp. 18, 25 (D.D.C.1973). If it is not unconstitutional for the government to assert that interest, at the very least that interest is less than compelling.

 The second interest which the state asserts is its interest in "protection of the legislature from surreptitious lobbying newsmen." Whether there are in fact such "surreptitious lobbying newsmen" or not is a matter beyond the judicial knowledge of this Court and the proof adduced in this case. Assuming *arguendo* that such lobbying newsmen exist, it may readily be admitted that a state has a substantial interest in requiring the disclosure of the lobbyist status of any who act in that capacity. This Court by no means casts any aspersion upon that interest of the state or upon its importance.

 However, it is not true that requiring detailed disclosures from the

press has a substantial nexus with that valid governmental interest. A part of the requirement of a substantial nexus, as noted above, is the requirement that the state pursue its governmental interest narrowly rather than broadly. In the context of this case, that requirement means that the state may regulate lobbying and lobbyists as such, but the state may not require disclosure from occupational groups virtually at random upon the theory that one or more members may be lobbyists.[7] If this is the governmental interest to be protected, the state should make its attack upon lobbyists as such. In fact, the state does have comprehensive statutes not here under attack which deal with the narrow question of lobbying as a specific activity. If newsmen engage in lobbying, there appears to be nothing to suggest that they are immune from control under such lobbying statutes. The state has offered no evidence of inability under its general lobbying provisions to ferret out genuine lobbyists among newsmen, if such exist. It should be emphasized that this Court does not intend to wrap the lobbying activities of any *genuine* newsman-lobbyist in the protective cloak of the First Amendment. The Constitution does not grant to newsmen immunity from general laws. Branzburg v. Hayes, 408 U.S. 665, 702, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (duty to testify before grand jury); Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936) (tax); Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (antitrust); Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 192–193, 66 S.Ct. 494, 90 L.Ed. 614 (1946) (Labor—F.L.S.A.).

▮ Thus, we conclude that requiring newsmen as a class to disclose the information required by Section 14 of this statute bears no substantial relation to the valid and admitted governmental interests in regulating lobbying.

▮ After balancing the First Amendment rights of the newsmen against the asserted interests of the state, we hold that Section 14 of the Alabama Ethics Statute is unconstitutional on its face.[8] An injunction will issue against its enforcement.

VARNER, District Judge (dissenting):

I am generally in accord with my brothers as to the applicable laws involved in this case and differ only in the conclusion with the excellently written majority opinion. My problem arises in considering that delicate balance, under the circumstances here involved, between the rights of the press and the interests of the State when considering the various provisions of the statute.

Conceivably, a part of § 14 is constitutionally valid and a part thereof is unconstitutional. If the parts are wholly independent of, or separable from, each other, the part which is valid or constitutional may stand while that which is invalid or unconstitutional will be rejected, Lynch v. United States, (Ga.) 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434; Wislar v. United States, 97 F.2d 152, 26 C.C.P.A. 138, cert. den. 305 U.S. 629, 59 S.Ct. 93, 83 L.Ed. 403; Newton v. City of Tuscaloosa, 251 Ala. 209, 36 So.2d 487. This rule has been held to apply even though the valid and invalid parts are in the same paragraph, sentence or section of the Act, Newton v. City of Tuscaloosa, supra; Harder v. Denton, 9 Cal.App.2d 607, 51 P.2d 199. Whether the valid and invalid parts of a statute are separable is a question of legislative intent, Electric Bond & Share Co. v. SEC, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; Carter v. Cart-

---

7. Even if the state were allowed to pick certain occupational groups for disclosure, it has not here picked other groups at least as likely or more likely to be engaged in lobbying— for instance, lawyers or the officers of state-wide associations.

8. It should be noted by all concerned that we have dealt only with Section 14 of the ethics statute. We do not cast any shadow on the legality of the balance of the Act.

er Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160; and the fact that a severability clause appears in the Act tends to indicate the legislative intent that the part of the statute which is valid should prevail, and a severability clause in the statute provides a basis for a rule of construction that the legislative intent was that the valid part should survive. Carter v. Carter Coal Co., supra; Utah Power & Light Co. v. Pfost, 286 U.S. 165, 52 S.Ct. 548, 76 L. Ed. 1038. A severability clause may create a presumption of the severability of the valid and invalid parts of the Act and a further presumption that the Legislature would have enacted the valid part alone, Electric Bond & Share Co. v. SEC, supra; Carter v. Carter Coal Co., supra; Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468. It is the considered conclusion of this writer that a part of this statute may be, and should be, saved.

The public is admitted to the galleries over the Legislature, and, to the extent that a press pass is required by the statute for admission of a news gatherer to the galleries, the requirement places a burden on the press, exclusively of all others, and is, therefore, unconstitutional and void. The State has no special interest therein.

I do not believe that the Legislature has the authority to require a declaration by any member of the press that he is not employed in any legislative or executive department of the government, that he is not employed by any person or corporation having legislation before the State Legislature, and that he will not become engaged in any such activities while covering news from the State Legislature. One may not be excluded from gathering news because of his employment or his beliefs. Consumers Union v. Periodical Correspondents' Assn., supra.

It must be remembered, however, that the business of gathering and distributing news to newspapers throughout the United States and foreign countries is not immune from regulation because it is an agency of the press, and a publisher of a newspaper has no special immunity from application of general laws. Associated Press v. National Labor Relations Board, (NY 1937) 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953. The rights of freedom of the press from restraint, license or censorship are not absolute but are relative, and publishers are subject to the general law as is any other industry conducted for profit. Four Star Publications, Inc. v. Erbe, (D.C. Iowa 1960) 181 F.Supp. 483, appeal dis. 304 F.Supp. 872. Where the government demonstrates compelling interest in regulation of persons with constitutional rights which overrides the interest of those persons in their regulated activities, the constitutional right, even a First Amendment right, of the individual must yield to the public interest. United States v. Pipe Fitters Local Union No. 562, (CA Mo.1970) 434 F.2d 1116, adhered to 434 F.2d 1127, cert. granted 402 U.S. 994, 91 S.Ct. 2168, 29 L.Ed.2d 160.

I agree that no State interest is involved in excluding the press from those areas available to the public generally. However, as to persons who, because they are affiliated with the press, have access to those places particularly set aside for the press itself by the Legislature, I disagree with my brothers. I am of the opinion that the requirement that all news gatherers who have special privileges, not accorded the general public, whereby they may have contacts with legislators or other governmental officers whom they may influence, may be required to furnish a statement of economic interest as provided in § 14 to the extent of giving the names of all newspapers and publications, radio stations, television stations or news gathering organizations by which they are employed and such other occupations, employments or financial interests as they may have. It is my opinion that the State of Alabama has a controlling interest in knowing the true motive of persons given special privileges to associate with governmental officers and

having an opportunity to influence them in accordance with the privileges now accorded news reporters who regularly attend State governmental functions, such as sessions of the Legislature. These persons, whether or not lobbying, are, by virtue of their daily contacts and the influence of their publications, in an advantageous position to influence government. This is especially true at the legislative level where subtle changes in language of bills may be extremely valuable to various private interests.

It is my opinion that that provision of the statute requiring approval by the State Ethics Committee of each special press pass may be construed to give unlimited discretion to the Ethics Committee in granting or denying press passes on such basis as they see fit, or it may be construed to require the State Ethics Committee to grant special press passes to those news gatherers who conform with the legal provisions (the disclosure clause) of § 14. I conceive that, if such provision is construed to give unbridled discretion to grant or deny special press passes, the same is unconstitutional as depriving news gatherers of their rights without due process of law, denying equal protection and infringing the freedom of the press. However, to the extent that said statute may be construed as requiring the State Ethics Committee to grant special press passes to those conforming with the legal requirements of said § 14, I conceive that said requirement is constitutional [1] as the State has a logical and controlling interest in identifying the financial interests of those enjoying special opportunities to influence State government.

As to that part of § 14 as follows:

"Members of the press who cover the State Legislature or state government in any way, either as a member of an editorial staff or through direct reporting, prior to being admitted to \* \* \* press rooms, committee rooms, committee meetings, any space set aside for use of the press, the floor of the legislature, or press conferences by a member of the legislature or a government official, shall file a statement of economic interest in accordance with the provisions of this Act at the office of the State Ethics Commission and shall have been approved by the State Ethics Commission for a special press pass and shall be subject to the provisions of the Act. The statement of economic interest filed by the members of the press shall further include the names of all newspapers or publications, radio stations, of news-gathering organizations by which they are employed, and what other occupations or employment they may have, if any;"

I would find as follows: (1) that said part is separable from, and enforceable independent of, the other parts of said § 14; (2) that the Legislature intended that such part should survive and become law in the event the other parts of the said section should be declared unconstitutional; and (3) that the State of Alabama has a controlling interest over the interests of the press in so regulating those enumerated news gatherers sufficient to validate said provisions.

I would further agree with my brothers that the other provisions of § 14 are unconstitutional and void.

I, therefore, respectfully dissent in part and concur in part with the opinion of my brothers.

---

1. Where the choice of constructions of an ambiguous statute allows a constitutional meaning or an unconstitutional meaning, the court will adopt such construction as will validate the statute. National Labor Relations Board v. Jones & Laughlin Steel Co., 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893; Tilton v. Richardson, Secy., 403 U.S. 672, 674, 91 S.Ct. 2091, 29 L.Ed.2d 790.